Filed 10/16/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| LORENZO BENTON et al., | B242441 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC349267, BC354230) |
| v. | |
| TELECOM NETWORK SPECIALISTS, INC., | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, John Shepard Wiley Jr., Judge.  Reversed and remanded for further proceedings.

Aiman-Smith & Marcy, Randall B. Aiman-Smith, Reed W.L. Marcy and Hallie Von Rock, for Plaintiffs and Appellants.

Cook Brown, Brian D. Bertossa and Carrie E. Bushman, for Defendant and Appellant.

_____

**INTRODUCTION**

Plaintiffs filed a wage and hour class action lawsuit against Telecom Network Services alleging, among other things, violation of meal and rest break requirements and failure to pay overtime. The proposed class consisted of approximately 750 cell-phone tower technicians, most of whom were hired and paid by staffing companies that contracted with TNS. The remainder of the technicians–approximately 15% of the proposed class–were hired and paid by TNS directly. Plaintiffs alleged that TNS was the employer of both categories of technicians and moved to certify their claims.

The trial court denied the motion, concluding that, even if it assumed TNS was the employer of every class member, plaintiffs could not establish TNS's liability through common proof because: (1) the technicians worked under "a diversity of workplace conditions" that enabled some of them to take meal and rest breaks; and (2) the staffing companies that hired and paid many of the TNS technicians had adopted different meal, rest break and overtime policies throughout the class period. We reverse the order and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

*A. Background Facts*

Telecom Network Specialists (TNS) provides personnel services to the telecommunication industry. TNS's customers, which include T-Mobile and Ericsson, own cell phone towers or supply cell phone equipment. TNS, in turn, locates "skilled technical laborers" to perform installation, maintenance and repair of equipment at its customer's cell sites. TNS retains its technicians either by hiring them directly, or through staffing agencies which locate and hire technical personnel. Under its agreements with these staffing agencies, TNS pays each agency an agreed upon hourly rate for each hour of labor worked by the technician; the agency, in turn, pays the technician a separate hourly rate.[1]

---

[1] These background facts are based on undisputed statements in the parties' pleadings or appellate briefs.

On June 27, 2006, plaintiff Lorenzo Benton filed a class action complaint against TNS alleging numerous violations of California wage and hours laws, including: failure to pay overtime (Labor Code, §§ 510, 1194; Cal. Code Regs., tit. 8, § 11040, subd. (3)); failure to provide adequate meal and rest breaks (§§ 226.7, 512; Cal. Code Regs., tit. 8, § 11040, subds. (11) & (12)); failure to furnish accurate wage statements and maintain accurate payroll records (§§ 226, 226.3, 1174, 1174.5; Cal. Code Regs., tit. 8, § 11040, subd. (7)); and unfair business practices. (Bus. & Prof. Code, § 17200.)[2]

The operative second amended complaint, filed in 2008, alleged that every technician "hired to perform work for TNS's [c]ustomers, either directly or through [staffing companies], were TNS's employees, regardless of whether they may have also been the employees of the [staffing companies]" or "the label TNS or any other entity purported to apply to those persons such as . . . . 'independent contractor' or otherwise." The complaint further alleged that "[n]either TNS nor its agents paid overtime" or "had any policy of providing meal breaks [or rest] breaks to the workers as required by California law."

Plaintiffs' "Class Action Allegations" stated that they sought to represent a class "consist[ing] of all persons who provided skilled technical labor for the benefit of TNS's [c]ustomers through TNS where the work was performed in California within . . . [the c]lass period . . . ." The complaint alleged that there were "numerous questions of law and fact common to the [class]," including, in part: "[w]hether TNS was the employer of the [c]lass [m]embers"; "[w]hether TNS provided meal [and rest] breaks in accordance

---

[2] The original complaint also named as a defendant "PK Diversified," which was a staffing company that had hired Benton to do work for TNS. The operative second amended complaint, however, only names TNS as a defendant and includes several additional named plaintiffs.

3

with California law"; and "[w]hether the [c]lass [m]embers were denied premium wages for overtime worked in violation of California law."**[3]**

### B. Plaintiffs' Motion for Class Certification

#### 1. Plaintiffs' motion and supporting evidence

##### a. Summary of plaintiffs' argument

On April 4, 2012, plaintiffs filed a motion for class certification asserting that the "principle [sic] issue presented in [the] suit . . . [was] whether TNS is the class members' co-employer – all other issues in the case flow closely from this one." Plaintiffs contended that this "princip[al] issue" could be determined on a class-wide basis through common proof demonstrating TNS exerted "exclusive day-to-day control" over all its technicians, including those who were referred to TNS by a staffing company (contractor technicians).**[4]**

In support, plaintiffs cited to evidence that, in their view, showed: (1) TNS treated its direct hire technicians and contractor technicians in the same manner; (2) TNS told contractor technicians what job site to attend and what work to perform; (3) while on the job site, contractor technicians worked under the exclusive control of TNS supervisors; (4) contractor technicians were required to enter their hours into TNS's "Trinity" time keeping system, which then had to be approved by TNS supervisors; and (5) the staffing companies did not have any personnel at the TNS job sites and performed no supervisory functions regarding the work that contractor technicians performed for TNS.

Plaintiffs also argued that TNS's liability for violating meal and rest period requirements could be determined on a class-wide basis. Plaintiffs contended that, under the applicable wage order, TNS was obligated to adopt a policy authorizing and

---

**[3]**    TNS filed cross-claims for indemnity against 43 staffing companies. In December of 2012, the trial court granted a motion for summary judgment in favor of all the remaining staffing companies.

**[4]**    For the purposes of clarity, we refer to technicians hired by TNS as "direct hire technicians" and technicians that were retained by a staffing company as "contractor technicians"; we refer to the two groups collectively as "technicians."

4

permitting all of its technicians to take their statutorily-mandated meal and rest breaks. They further asserted that the evidence showed TNS had failed to adopt any such policy. Plaintiffs raised similar arguments regarding their overtime claims, asserting that common proof could be used to determine whether TNS had violated overtime laws by failing to ensure its staffing companies had paid the contractor technician's overtime.

### b. *Summary of evidence filed in support of motion for certification*

Plaintiffs' motion was supported by: (1) more than 40 declarations from putative class members; (2) deposition testimony from two TNS employees and six staffing company employees; (3) numerous documents, including various TNS employee handbooks and several "master services agreements" that TNS had entered into with its staffing companies; and (4) a declaration from plaintiffs' counsel.

The content of the plaintiffs' class member declarations (only one of which was from a direct hire technician) was essentially identical. The declarants each stated that, after being hired by a staffing company, they were told to contact TNS to obtain information about their assignment. "Once [the contractor technician] made the initial contact at TNS, the day-to-day working conditions . . . were controlled exclusively by TNS." The technicians' assignments were distributed by a TNS supervisor, who told the technicians where to go and what work needed to be performed when they arrived. The technicians generally travelled from cell site to cell site, working either alone or with a team of other technicians. The work generally "consisted of performing installation, upgrading, testing and maintenance of cellular telephone sites in the field according to the direction of TNS." According to the declarants, once they had received their assignment from TNS, the staffing company did not provide "any instructions, direction or supervision . . . regarding either what work [to] do or how to perform it. . . ."

On the issue of rest periods, each of the declarants asserted: "No one at TNS ever told me what a rest break or meal break was, or whether I was permitted or entitled to take breaks, or when to take breaks, or anything else about breaks." The technicians reported that although they were occasionally able to take breaks, they were rarely able to

take an uninterrupted 10-minute rest break, or a 30-minute meal period. The inability to take uninterrupted breaks was caused, in part, by the technicians' schedules and the nature of the cellular communications business. The declarants explained that TNS sought to avoid disruptions in cell service and therefore required its technicians to complete their job assignments "as quickly as possible"; frequently, work had to be completed during a "maintenance window" that ran between 10:00 p.m. and 6:00 [a].m., when "customer demand for service coverage is lowest." TNS placed "considerable pressure" on technicians to "finish the work within the window and not to go into the peak service hours." Thus, it was "usually not practical to take either rest or meal breaks while the work was ongoing. This was particular true when [a technician] was working alone . . . ."

The declarants also stated that the staffing companies did not have any way of knowing if technicians were taking meal and rest periods. Each declarant also alleged that he or she had not considered any information the staffing company had provided regarding break periods, explaining: "Regardless of any policies regarding breaks that [the staffing company] might have had, I was being directly told what to do and supervised by TNS and I never considered whether the [staffing company] wanted me to take breaks. . ."

The declarants also reported that they were required to enter their hours into a TNS time-keeping system called "Trinity." A TNS supervisor was required to approve the technician's reported time before it was finalized and reported to the staffing company. The Trinity system did not record whether technicians had taken rest or meal breaks, nor were technicians told to record when they had missed a break.[5]

---

[5] Each of the declarations contains additional allegations asserting that supervisors frequently refused to approve all of the time that the technician had entered into Trinity. These allegations relate to plaintiffs' "off the clock" claims, which are not at issue in this appeal.

Plaintiffs also submitted excerpts from depositions of two individuals TNS had designated as "persons most knowledgeable" (see Code of Civil Proc., § 2025.230[6]): Jeffrey Ellis, who provided testimony about TNS's practices regarding contractor technicians; and Neal Gee, who provided testimony about TNS's practices regarding direct hire technicians. Ellis had worked for TNS since 2001 and supervised technicians in California between 2001 and 2003, and again in 2009. As a supervisor, he was responsible for creating a work schedule, deploying technicians and ensuring the quality of the technicians' work. Ellis stated that TNS maintained "ultimate control" of the work sites and was "responsible for the final quality of the work." Ellis reported that, while on the job sites, TNS treated its direct hire technicians and contractor technicians in exactly the same way; both groups of technicians performed the same work, attended the same meetings and used the same type of equipment. Ellis also stated that a supervisor would not be able to distinguish a direct hire technician from a contractor technician based on their day-to-day duties.

Ellis testified that the technicians normally worked alone at a cell site. When asked what "instruction [he] would give . . . worker[s] as far as meal breaks and rest breaks," Ellis stated: "I would not tell them . . . you need to take a lunch now. They are in charge at the site. . . . [T]hey take their breaks, and they take their lunches when they take them." Ellis was also asked what he did to ensure technicians working in the field took a 30-minute meal period for every five hours of work. In response Ellis stated, "[a]t the time I was out there, I was unaware that that was a California law requirement," adding, "[b]ut as far as lunches and breaks, [technicians] understood that was all right" and decided on "an individual basis on how . . . [to take] their meals." Ellis explained that he first learned about California's meal and rest period requirements through this lawsuit,

---

**6** Code of Civil Procedure section 2025.230 states: "If the deponent named is not a natural person, the deposition notice shall describe with reasonable particularity the matters on which examination is requested. In that event, the deponent shall designate and produce at the deposition those of its officers, directors, managing agents, employees, or agents who are most qualified to testify on its behalf as to those matters to the extent of any information known or reasonably available to the deponent."

which was "not common knowledge within the company." After learning about California's meal and rest period requirements, Ellis began informing technicians that they needed to read wage and hour posters that appeared at some of the TNS job sites and take their required meal and rest breaks. Ellis did not know if any other TNS supervisors or managers told technicians that they were entitled to meal and rest periods.

Ellis also stated, however, that in 2009 the president and vice president of TNS informed supervisors that technicians should start recording their meal periods into the "notes" section of Trinity. In 2010, Ellis received an email from management reminding supervisors to tell their technicians that they were required to comply with this requirement.

Neal Gee testified that, prior to 2009, TNS hired very few technicians directly, relying "primarily" on contractor technicians. Gee authenticated TNS employee handbooks from 2004, 2008 and 2008 and confirmed that TNS provided a handbook to all of its direct hire technicians. Each of the handbooks contained an identical "Meal and Rest Period Breaks" section stating: "Your supervisor will inform you when meals or breaks are to be taken and will designate the area to be used. Short rest breaks will usually be paid time and may be interrupted as necessary. You must remain on [TNS] premises when taking a [TNS]-paid break. Meal periods are usually non-paid time; therefore you should not work during that time. During exceptionally busy times, it may be necessary to shorten or interrupt scheduled lunch periods . . . ." Gee also testified that contractor technicians did not receive an employment manual or any other documents describing "any kind of policies and procedure[s] . . . they were supposed to do or not do." Gee also reported that, currently, all its technicians were required to record their meal and rest break periods in the notes section of Trinity.

Plaintiffs also submitted deposition testimony from six different staffing company employees, which showed that some of the companies had adopted meal and rest break policies and others had not. All of the staffing company employees, however, indicated that their company had "no way of knowing" whether the contractor technicians were "taking breaks when they were working on TNS jobs." Several of the staffing company

8

employees also stated that their company had no supervision, control or involvement in the day-to-day activities of contractor technicians who were working on a TNS project.

The documentary evidence plaintiffs submitted in support of their motion included numerous different "master service agreements" (MSAs) that TNS had entered into with its staffing companies between the years of 2003 and 2011. Although the terms of the MSAs were largely consistent, the wording of some provisions differed. Each of the MSAs stated that TNS had agreed to pay the staffing company a fixed, hourly rate for each contractor technician's time; the staffing company, in turn, was "solely responsible" for compensating the contractor technician. The MSAs required the staffing company to submit weekly invoices, which were to be supported by copies of "Trinity time sheets, approved by TNS's designated Site Manager." The hourly rate that TNS paid to the staffing company did not have an overtime component, meaning that it paid the same hourly rate to the staffing company regardless of how many hours the technician worked during that time period.

All of the MSAs provided that TNS was "responsible for accepting or rejecting the [w]ork performed by [the contractor technician]" and retained sole discretion to remove any contractor technician from the work site. MSAs entered into in or before 2009 further provided that TNS was entitled to designate a site manager to maintain "control of the Work site" and required that contractor technicians "follow his direction at all times."

MSAs entered into in 2010 and 2011 included a provision stating that the staffing company would "notify employees in writing of their rights and responsibility under applicable state and federal wage and hour laws including but not limited to, where applicable, any entitlement to overtime and/or double time, [and] any entitlement to meal and rest periods . . . ." MSAs entered into in 2008 and 2009 contained a similar provision under which the staffing company coveted to comply with all applicable "federal and state wage and hour laws." MSAs entered into in 2003 and 2005 contained no reference to compliance with wage and hour laws.

Plaintiffs also submitted a declaration from their attorney indicating that she had reviewed "payroll records" that several staffing companies had produced during

9

discovery.  The attorney stated that, based on her review, it "appear[ed] that six [staffing companies] paid overtime rates in accordance with California law.  The payroll records provided by other [staffing companies] appear[ed] to show that either the [staffing company] did not pay overtime rates or underpaid overtime required by California law."

### 2. *TNS's opposition and supporting evidence*

In its opposition, TNS asserted that class certification was improper because the evidence showed that "common issues do not predominate."  According to TNS, the evidence showed that "the putative class members performed different types of work under very diverse working conditions, they were not uniformly classified as . . . employees, they worked for a variety of companies with diverse overtime and pay and payroll reporting practices, and with no or different meal and rest period policies that were implemented at various times during the class period."

TNS argued that whether it qualified as a joint employer of the contractor technicians could not be determined through common proof because the evidence showed technicians were subject to varying levels of control and supervision.  TNS contended that technicians normally worked alone, without any supervision and that many felt as if they were their own supervisors.  TNS further asserted that each of the named plaintiffs had personally admitted in deposition testimony that they had little interaction with TNS supervisors during their day-to-day activities.

TNS also argued that, even if its status as a joint employer could be determined on class-wide basis, "common issues [did] not predominate as to whether TNS was liable for alleged missed meal and rest periods."  TNS contended that, in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*) – which had been decided one week before TNS filed its opposition – the California Supreme Court clarified that "to establish liability for a missed . . . break[s], the employee must show that he was forced to forego his . . . break, as opposed to merely showing that he did not take it regardless of the reason."  In TNS's view, *Brinker* demonstrated that its "liability c[ould] not be

10

established without individual trial to determine whether and why each class member did not take a break on any particular day."

TNS also argued that the court should deny certification of the break claims because plaintiffs had not identified any "uniform policy or practice" regarding meal and break periods; rather, according to TNS, the parties' evidence showed that the staffing companies had a variety of different policies regarding meal and rest periods, thereby demonstrating that "no uniform policy was applied on a class-wide basis." TNS further contended that the evidence showed that: (1) many technicians worked with limited supervision, and therefore had the ability to take breaks whenever they wanted; (2) some technicians had been informed of their meal and rest period rights through a TNS supervisor or a staffing company; and (3) although some technicians took breaks, others chose to skip them in an effort complete their assignments more quickly.

TNS raised similar arguments regarding plaintiffs' overtime claim, asserting that plaintiffs' evidence showed that some staffing companies had a policy of paying overtime, while others did not. TNS argued that, in light of this evidence, "an individualized inquiry w[ould] be required to determine, with respect to each and every [staffing company], whether they paid recorded overtime in compliance with California law."

In support of its opposition, TNS provided declarations from 15 putative class members – nine direct hires and six contractors – that described the different types of work that TNS's technicians performed. According to the declarations, technicians normally worked at either a "cell site" or a "switch station." The "cell sites" were indoor or outdoor shelters that housed cell phone antennas and electronic telecommunication equipment. The sites were located in a wide range of geographic locations, including rooftops, office buildings and remote outdoor areas. The technicians' work at the cell sites consisted of installing new telecommunications equipment, loading communications software and testing new equipment. The amount of time the technicians spent at each site differed depending on the nature of the assignment; some days technicians worked at a single cell site, and other days they traveled to many different sites. Technicians also

11

worked at different times of the day; some technicians worked during the daytime, while others worked at night, during the "maintenance window." TNS's declarations explained that, in contrast to cell sites, "switch stations" were located in office buildings owned by TNS's customers. Technicians would frequently stay at the same switch station for "several weeks" installing and testing new equipment that was not yet in service.

TNS's declarations also described the technicians' experiences with meal and rest periods. All 15 of the declarants indicated that because they normally worked without supervision, they were able to take breaks whenever they wanted. The technicians stated that they took meal and break periods when they felt they were needed, and that TNS had never discouraged or prevented technicians from taking breaks. Although some of the declarants stated that TNS did not provide any information regarding rest and meal periods, one technician stated that "TNS made it clear" that he was entitled to meal and rest breaks. Several other technicians stated that they had become aware of their meal and rest break rights either through their staffing company or through wage and hour posters that were located at some of the job sites. Three of the declarants, all of whom had been hired by TNS between 2010 and 2011 (which was four to five years after the case was filed), reported that their TNS supervisors had told them to take their meal and rest periods.

Finally, each TNS's declarations indicated that technicians who reported working more than 40 hours in a week, or 8 hours in a day, had received overtime pay.

### C. Trial Court Proceedings on Plaintiffs' Motion for Certification

Prior to the hearing on plaintiffs' motion, which was held on May 2, 2012, the trial court issued a tentative ruling denying certification. The tentative order explained that, even if the court assumed TNS was the joint employer of the contractor technicians, certification was improper because the evidence showed that: (1) some technicians worked under conditions that permitted them to take breaks, while others did not; and (2) some of the staffing companies had adopted proper overtime and meal and rest period

12

policies, while others had not. In the court's view, this evidence showed that substantial, individual inquiry would be necessary to determine whether TNS was liable to the class.

At oral argument, plaintiffs' counsel argued that the staffing companies' meal and break policies were irrelevant because the "unrefuted . . . evidence is that those staffing companies had no knowledge [or control] of whether any of those policies were or could be carried out" at the work site. In response, defense counsel argued that, under *Brinker, supra,* 53 Cal.4th 1004*,* TNS was only obligated to provide its workers "the opportunity to take breaks" and that plaintiffs had provided no evidence of a class-wide policy denying or discouraging meal and rest periods. Defense counsel further asserted that the evidence showed some class members were informed of their meal and rest period rights, while others were not, and that some class members had taken their meal and rest periods, while others had not.

Plaintiffs' counsel disagreed with TNS's interpretation of *Brinker*, asserting that TNS's failure to adopt any policy authorizing and permitting technicians of their meal and rest breaks constituted a class-wide violation that could be properly certified. The court, however, disagreed, explaining that it did not believe that an employer's failure to adopt a "policy authorizing [meal and rest] breaks [constituted a] class-wide violation." Rather, the court believed that, under *Brinker*, the employer was merely required to provide its employees "liberty" to take meal and rest periods; the court further explained that the parties' evidence demonstrated there was no uniformity as to whether class members had been provided such "liberty" in this case.

Following the hearing, the court entered a written order adopting its tentative ruling denying plaintiffs' motion for certification. The order explained that, even if the court assumed "TNS [wa]s the co-employer of all . . . class members, . . . . th[e] group of workers [wa]s too diverse for class treatment . . . . in two different ways." The order first explained that the parties' evidence showed that class members were governed by diverse "management policies." More specifically, the court found that the 34 "'staffing companies'" who provided workers to TNS had adopted a variety of different policies

13

regarding rest and meal periods.  The order cited evidence indicating that some of the staffing companies had adopted meal and rest period policies while others had not.

The second reason the court provided in support of denial was that "the physical workplace situations [of class members] are diverse."  According to the order, the parties' evidence showed that "[c]ell sites differ one from another, and all cell sites differ from switch stations.  At many of these places, the putative class members effectively worked as their own bosses when it came to meal and rest breaks.  In other words, no one was around to tell them when to work or when to break – they were at liberty to do as they pleased.  Whether there were break violations turns on specific details about what happened at each specific site. . . ."

In summarizing its ruling, the court's order explained that the "evidence . . . shows . . . [t]here is no single way to determine whether TNS is liable to the class for failure to provide breaks.  Some workers did not get breaks.  Other workers were on their own and at complete liberty to take breaks as they pleased, with no time or management pressure."  The order also stated that "the same holds true for the proposed overtime class."

Plaintiffs filed a timely appeal of the court's order denying certification.  (See *Richmond v. Dart Industries, Inc*. (1981) 29 Cal.3d 462, 470 ["A decision by a trial court denying certification to an entire class is an appealable order"].)

## DISCUSSION

### A.  *Legal Principles Regarding Class Certification and Standard of Review*
"Class actions are statutorily authorized 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court. . . .'  (Code Civ. Proc., § 382.)" (*Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524, 1530 (*Ghazaryan*).) The party seeking certification has the burden to establish, among other things, that common issues predominate in the litigation.  (See *Sav-on Drug Stores, Inc. v. Superior Cou*rt (2004) 34 Cal.4th 319, 326 (*Sav-on*).)

14

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.] A trial court ruling on a certification motion determines 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations]" (*Sav-on, supra,* 34 Cal.4th at p. 326.) "On the issue whether common issues predominate in the litigation, a court must 'examine the plaintiff's theory of recovery' and 'assess the nature of the legal and factual disputes *likely to be presented.*' [Citation.] . . . . In conducting this analysis, a 'court must examine the allegations of the complaint and supporting declarations [citation], and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. "As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages."' [Citation.]" (*Bradley v. Networkers International* (2012) 211 Cal.App.4th 1129, 1141-1142 (*Bradley*).)

"A trial court is generally afforded great latitude in granting or denying class certification, and we normally review a ruling on certification for an abuse of discretion. [Citation.] This deferential standard of review, however, is inapplicable if the trial court has evaluated class certification using improper criteria or an incorrect legal analysis: '[A] trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made."' [Citations.]" (*Ghazaryan, supra,* 169 Cal.App.4th at p. 1530.) In conducting our review, we "'"must examine the trial court's reasons for denying class certification.' [Citation.] . . . . [We] 'consider only the reasons cited by the trial court for the denial, and ignore other reasons that might support denial.' [Citation.]" (*Jaimez v. Daiohs USA, Inc*. (2010) 181 Cal.App.4th 1286, 1297-1298 (*Jaimez*).)

### B. *Summary of Applicable Wage and Hour Requirements and Recent Case Law Addressing Wage and Hour Certification Motions*

#### 1. *Summary of applicable wage and hour rules and statutes*

Plaintiffs sought certification of two subclasses of claims:  violation of meal and rest period provisions and failure to pay overtime. California's meal and rest break rules, as well as rules governing overtime pay, are contained in wage orders issued by the Industrial Welfare Commission (IWC) "on an industry-by-industry basis." (*Bradley, supra*, 211 Cal.App.4th at p. 1149; see also *Brinker, supra*, 53 Cal.4th at pp. 1026-1027.) The telecommunications employees in this case are covered by Wage Order No. 4 (Wage Order), which is codified in the California Code of Regulations at title 8, section 11040. (See *Bradley, supra*, 211 Cal.App.4th at p. 1149.)

The rest period provisions of the Wage Order require that every employer "authorize and permit all employees to take rest periods, which . . .  shall be based on the total hours worked daily at the rate of ten . . . minutes net rest time per four . . . hours or major fraction thereof."  (Cal. Code Regs., tit. 8, § 11040, subd. (12)(A).)  Rest periods are to be "counted as hours worked" and employers are required to pay one hour of pay at the regular rate "for each workday that the rest period is not provided."  (Cal. Code Regs., tit. 8, § 11040, subds. (12)(A) & (B).)

The Wage Order's meal period provisions require, in relevant part, that "[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes . . . .  Unless the employee is relieved of all duty during a 30 minute meal period, the meal period shall be considered an 'on duty' meal period and counted as time worked."  (Cal. Code Regs., tit. 8, § 11040, subd. (11)(A); see also Labor Code, § 512.)  As with rest periods, the employer is required to pay one hour of compensation at the regular rate "for each workday that the meal period is not provided."  (Cal. Code Regs., tit. 8, § 11040, subd. (11)(B).)

Finally, the Wage Order's overtime provisions require, in part, that each employee receive one and half times their regular rate of pay for all hours worked in excess of 40 hours in a work week.  The Order further requires that employees receive one and half

16

times their regular pay for all hours worked in excess of eight hours in a single day, and double their regular rate of pay for all hours worked in excess of 12 hours in a single day. (Cal. Code Regs., tit. 8, § 11040, subd. (3)(A).)  Labor Code section 1194, in turn, provides employees a cause of action for unpaid overtime against their employer (or employers).  (See *Martinez v. Combs* (2010) 49 Cal.4th 35, 49-50 (*Combs*).)

### 2. *Recent case law addressing wage and hour certification motions*

In 2008, the California Supreme Court granted review in *Brinker v. Superior Court* (previously published at 80 Cal.Rptr.3d 781; review granted October 22, 2008, S166350), which addressed numerous issues regarding the scope of an employer's meal and rest break obligations and the criteria used to assess motions seeking to certify wage and hour claims.  Following its grant of review in *Brinker*, the Court granted review of several additional cases involving wage and hour certification issues cases and ordered that they be held pending its decision in *Brinker*.  Among those cases were *Bradley v. Superior Court* and *Faulkinbury v. Boyd & Associates, Inc.*, both of which had affirmed a trial court order denying certification of meal, rest break and overtime claims.  (See *Bradley, supra*, 211 Cal.App.4th at pp. 1133-1134; *Faulkinbury v. Boyd & Associates* (2013) 216 Cal.App.4th 220, 224 (*Faulkinbury*) [describing procedural history].)

Several weeks before the trial court entered its order denying certification in this case, the Supreme Court issued its decision in *Brinker, supra,* 53 Cal.4th 1004.  Shortly thereafter, the Court remanded *Bradley* and *Faulkinbury* to the Court of Appeal with directions to vacate the prior decisions and "'reconsider the cause[s] in light of *Brinker*.'" (*Bradley, supra*, 211 Cal.App.4th at p. 1134; *Faulkinbury, supra,* 216 Cal.App.4th at p. 224.)  Following remand, the *Bradley* and *Faulkinbury* courts each issued published decisions holding that, under the analysis set forth in *Brinker*, the trial court had erred in denying class certification.  Because *Brinker*, *Bradley* and *Faulkinbury* are highly relevant to the issues presented here, we summarize them at length.

17

### a. *Brinker v. Superior Court*

In *Brinker*, *supra*, 53 Cal.4th 1004, plaintiffs sought class certification of various wage and hour claims on behalf of restaurant employees governed by Wage Order No. 5.[7] The plaintiffs' motion requested certification of several subclasses, including: "(1) a class alleging employees were not provided their required 10-minute rest breaks; (2) a class alleging employees were not provided timely and sufficient meal breaks. . . ."[8] (*Bradley, supra*, 211 Cal.App.4th at p. 1142.) The trial court granted the motion, but the Court of Appeal reversed. The Supreme Court granted review "to resolve uncertainties in the handling of wage and hour class certification motions." (*Brinker, supra*, 53 Cal.4th at p. 1021.)

Plaintiffs' rest break claim asserted that defendant had adopted a uniform, unlawful policy that provided employees a single 10-minute rest break for every four hours worked. Plaintiffs contended that this policy violated Wage Order No. 5's rest period rules, which required a 10-minute rest break "'per four . . . hours or major fraction thereof,'" except where the employees "total daily work time" totaled "less than three and one-half . . . hours.'" (*Brinker, supra*, 53 Cal.4th at p. 1028.) Under plaintiffs' theory, the defendant's policy unlawfully denied a rest period to employees who had worked more than three and one-half hours, but less than four hours, and unlawfully denied a second rest break period to employees who had worked more than six hours, but less than eight hours.

Although the trial court ruled plaintiffs' rest break claim was amenable to class treatment, the Court of Appeal disagreed, explaining, in part, that "because rest breaks

---

[7] The parties do not dispute that the relevant rest and meal periods provisions set forth in Wage Order No. 5 are identical to those set forth in Wage Order No. 4. (See *Bradley, supra*, 211 Cal.App.4th at p. 1149.)

[8] The plaintiffs in *Brinker* also sought certification of a class "alleging employees worked "off the clock (without pay)." (*Bradley, supra*, 211 Cal.App.4th at p. 1142.) Although plaintiffs in this case alleged a similar "off the clock" claim, they did not seek certification of the claim nor have they referenced it in this appeal. Accordingly, we do not address the portion of *Brinker* analyzing "off the clock" claims.

18

can be waived . . . 'any showing on a class basis that plaintiffs or other members of the proposed class missed rest breaks or took shortened rest breaks would not necessarily establish, without further individualized proof, that [the defendant] violated' . . . Wage Order No. 5." (*Brinker, supra*, 53 Cal.4th at p. 1033.)  Stated more simply, the court ruled that, to establish liability under the applicable rest period provisions, each class member would have to demonstrate he or she missed or took shortened break periods as a result of defendant's allegedly unlawful policy, rather than as a result of waiver, which would require substantial individual inquiry.

The Supreme Court began its analysis by clarifying the scope of the rest period requirements, which require an employer to provide "10 minutes rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours . . . ." ,." (*Brinker, supra*, 53 Cal.4th at p. 1029.)  The Court further held that the trial court had properly certified plaintiffs' rest break claim because "[c]lasswide liability could be established through common proof" that the defendant's uniform rest break policy violated those requirements.  (*Id.* at p. 1033.)

In reaching its holding, the Court rejected the Court of Appeal's reasoning that the defendant would only become liable only upon a showing that each class member missed his or her break period as a result of the allegedly unlawful policy, rather than through waiver:  "An employer is required to authorize and permit the amount of rest break time called for under the wage order for its industry.  If it does not – if, for example, it adopts a uniform policy authorizing and permitting only one rest break for employees working a seven-hour shift when two are required – it has violated the wage order and is liable.  No issue of waiver ever arises for a rest break that was required by law but never authorized; if a break is not authorized, an employee has no opportunity to decline to take it.  As [plaintiffs] pleaded and presented substantial evidence of a uniform rest break policy authorizing breaks only for each full four hours worked, the trial court's certification of a rest break subclass should not have been disturbed."  (*Ibid.*)

19

The Court further explained that although it had, at the parties' request, agreed to address the scope of an employer's rest break duties, the preferred practice was "to determine class certification independent of threshold questions disposing of the merits." (*Brinker, supra*, 53 Cal.4th at p. 1034.) The Court concluded that, for the purposes of deciding the certification issue, it was sufficient that plaintiffs' "theory of liability – that [defendant] has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law – is by its nature a common question eminently suited for class treatment." (*Ibid*.)

The Court also addressed plaintiffs' meal break claims, which had two components: (1) the defendant had allegedly failed to "ensure that work stops for the required thirty minute" meal period (*Brinker, supra*, 53 Cal.4th at p. 1034); and (2) the defendant had allegedly failed to provide a second meal period no later than five hours after the end of the first meal period. On the first claim, the Court agreed with defendant's contention that "an employer is obligated only to 'make available' meal periods, with no responsibility for whether they are taken." (*Ibid*.) The Court explained that, to discharge its meal period obligations, the employer need only "relieve[] its employees of all duty, relinquish[] control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and . . . not impede or discourage them from doing so. . . . [T]he employer is not obligated to police meal breaks and ensure no work thereafter is performed." (*Id*. at pp. 1040-1041.)

The Court also rejected the second part of plaintiffs' claim, clarifying that "an employer's [only] obligation is to provide a first meal period after no more than five hours of work and a second meal period after no more than 10 hours of work." (*Brinker, supra*, 53 Cal.4th at p. 1049.) Thus, for example, contrary to the plaintiffs' reading of the meal requirements, an employee who was provided a meal period during the first hour of an eight hour shift was not entitled to a second meal period.

On the issue of certification of the meal break claim, the Court elected to remand the question to the trial court, concluding that the trial court's order "may have been influenced" by the "erroneous legal assumption" that employees are entitled to "a meal

20

period every five hours." (*Brinker, supra*, 53 Cal.4th at p. 1050.) The Court explained that because its ruling had "changed the legal landscape," the "prudent course" was to remand the issue to the trial court "in light of the clarification of the law . . ." (*Id*. at pp. 1050-1051.)

### b. *Bradley v. Superior Court*

In *Bradley, supra,* 211 Cal.App.4th 1129, plaintiffs sought to certify a class of telecommunications technicians whose job duties were similar (if not identical) to the duties of the purported class members at issue in this case. The defendant, Networkers International, contracted with "telecommunication companies . . . to supply skilled laborers to install and service cell sites in Southern California." (*Id*. at p. 1129.) To fulfill these contracts, Networkers retained approximately 140 "field technicians" to "provide repair and installation services at the cell sites." (*Ibid*.) Each technician was required to sign a standardized "'Independent Contractor Agreement'" containing language reflecting an independent contractor relationship. Because Networkers characterized the technicians as independent contractors, it "did not pay premium wages for overtime or establish a policy requiring meal or rest breaks." (*Id*. at p. 1135.) At some point in 2005, Networkers reclassified its technicians as employees and began paying them overtime; the company did not, however, implement a meal or rest break policy.

In 2006, plaintiffs filed a class action alleging Networkers violated wage and hour laws by, among other things, failing to pay overtime and failing to adopt a policy providing its technicians rest and meal breaks. In support of their motion for certification, plaintiffs submitted numerous class declarations asserting that the technicians' job duties and working conditions differed substantially from the job description set forth in Networker's standardized "Independent Contractor Agreement." Each declarant also denied having been paid overtime or receiving meal or rest breaks. In addition to the declarations, plaintiffs submitted discovery responses in which Networkers admitted that: (1) it did not pay overtime to its technicians members until the

21

2005 reclassification; (2) it did not have a rest or meal break policy or maintain records of rest or meal breaks; and (3) because it did not supervise its technicians, it did not know whether the workers took rest or meal breaks, nor did it know the extent or frequency of such breaks. (*Bradley, supra*, 211 Cal.App.4th at p. 1140.)

The trial court denied certification for two reasons. First, it explained that individual issues predominated as to whether each class member qualified as an independent contractor. (*Bradley, supra*, 211 Cal.App.4th at p. 1140.) Second, the court concluded that certification was improper because, to establish Networkers' liability, each technician would have to individually demonstrate "'the actual existence of damages and/or the manner of incurring damages.'" (*Ibid*.) In its initial (now vacated) opinion, the Court of Appeal affirmed, ruling that although substantial evidence did not support the trial court's finding that individual issues would predominate the question whether class members qualified as independent contractors, "there were reasonable grounds for the trial court to conclude that . . . [determining] the existence and amount of damages for each class member" would require individual inquiry into "which employees had missed breaks and whether those missed breaks were the result of Networkers' lack of a break policy." (*Id.* at pp. 1145, 1151 [explaining reasoning set forth in its vacated opinion].)

On remand from the Supreme Court, however, the Court of Appeal concluded that, under the analysis set forth in *Brinker*, the trial court had improperly focused on individual issues related to damages, rather than on the plaintiffs' theory of liability. (*Bradley, supra*, 211 Cal.App.4th at p. 1151.)[9] According to the court, *Brinker* had clarified that "in ruling on the predominance issue in a certification motion, the court must focus on the plaintiff's theory of recovery and assess the nature of the legal and factual disputes likely to be presented and determine whether individual or common

---

[9] The Court of Appeal concluded that "no aspect of *Brinker*" had affected its prior conclusion that the legal issue of whether Networkers properly classified its technicians as independent contractors, rather than employees, was susceptible to class treatment. (*Bradley*, *supra*, 211 Cal.App.4th at p. 1145.)

issues predominate." (*Id*. at p. 1150.)  The court further explained that "plaintiffs' theory of recovery [wa]s based on Networkers' (uniform) lack of a rest and meal break policy and its (uniform) failure to authorize employees to take statutorily required rest and meal breaks.  The lack of a meal/rest break policy and the uniform failure to authorize such breaks are matters of common proof.  Although an employer could potentially defend these claims by arguing that it did have an informal or unwritten meal or rest break policy, this defense is also a matter of common proof." (*Id*. at p. 1150.)

*Bradley* further explained that *Brinker* had "expressly rejected . . . that evidence showing some employees took rest breaks and other employees were offered rest breaks but declined to take them made class certification inappropriate." (*Bradley, supra*, 211 Cal.App.4th at p. 1143.)  Rather, *Brinker* made clear that "when an employer has not authorized and not provided legally-required meal and/or rest breaks, the employer has violated the law" and is liable.  (*Id*. at p. 1151.)  According to the court, "under . . . [*Brinker's*] logic, . . . . the fact that an employee may have actually taken a break or was able to eat food during the work day" would only be relevant to determining individual damages, which was not a sufficient basis for denying class certification.  (*Id*. at p. 1151; 1153.)

The court applied similar analysis to plaintiffs' overtime claim, concluding that whether Networkers had violated wage and order laws by failing to pay its technicians overtime prior to 2005 could be determined on a class-wide basis.  The court rejected Networkers' argument that certification was improper because "the *amount* of overtime pay damages" would require "individualized analysis" as to the "number of hours [technicians] worked each day." (*Bradley, supra*, 211 Cal.App.4th at p. 1155.)  As with the meal and rest break claim, the court concluded that such issues were only relevant to determining the existence and amount of each class member's damages.

### c.  *Faulkinbury v. Superior Court*

In *Faulkinbury*, *supra,* 216 Cal.App.4th 220, plaintiffs sought to certify a wage and hour class action on behalf of 4,000 current and former security guards.  Plaintiffs

23

asserted that the defendant had violated meal and rest period requirements by: (1) forcing its employees to sign an agreement stating that the nature of their work required them to take their meal periods "on-duty"; and (2) failing to authorize or permit rest breaks. Defendant, however, argued that its break policy was proper under the "nature of the work exception," which permits on-duty meal periods "'when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to.' (Cal. Code Regs., tit. 8, § 11040, subd. 11(A).)" (*Id.* at p. 234.) The defendant further contended that determining whether it was liable for meal and rest break violations would require individualized inquiry into whether each employee had actually taken on-duty meal breaks and missed rest breaks as the result of the defendant's policies. (*Id.* at p. 237.) The trial court denied certification, concluding that plaintiffs' claims turned on individual issues regarding the circumstances of each security officer's employment conditions.

In its pre-*Brinker* opinion, the appellate court affirmed the order denying certification. On plaintiffs' meal break claim, the court concluded that even if the defendant's uniform on-duty meal break policy was "unlawful," the defendant would only become liable upon an individualized showing that each security guard actually took on-duty meal periods. (See *Faulkinbury, supra*, 216 Cal.App.4th at p. 235 [explaining the reasoning set forth in its vacated opinion].) Similarly, on plaintiffs' rest break claim, the court ruled that the defendant's liability for failing to authorize and permit rest breaks could not be established without individual inquiry into whether each employee had been provided the opportunity to take rest periods. In support, the court noted that several putative class members had provided declarations indicating that they had been relieved of their duties to take rest breaks, or were otherwise able to take rest breaks during periods of inactivity. (*Id.* at p. 237.)

Upon remand from the Supreme Court, the appellate court concluded that *Brinker* had rejected the mode of analysis set forth in its original opinion. As to plaintiffs' meal break claim, the appellate court explained that *Brinker* clarified that the defendant's liability would attach "upon a determination that [defendant's] uniform on-duty meal

24

break policy was unlawful . . . . Whether or not the employee was able to take the [off-duty] required break goes to damages, and '[t]he fact that individual [employees] may have different damages does not require denial of the class certification motion.' [Citation.]" (*Faulkinbury, supra*, 216 Cal.App.4th at p. 235.)

The court reached a similar conclusion regarding plaintiffs' rest break claim, explaining that plaintiffs had alleged the defendant "had no formal rest break policy" and required employees to stay at their post for their entire shift. (*Faulkinbury, supra*, 216 Cal.App.4th at p. 236.) The court ruled that, under the analysis set forth in *Brinker,* the "the lawfulness of [defendant's] lack of rest break policy and requirement that all security guard employees remain at their posts can be determined on a classwide basis." (*Id*. at p. 237.) The court further concluded that *Brinker* had rejected its prior reasoning that evidence showing some class members were authorized or able to take rest breaks was sufficient to defeat certification: "While, in *Faulkinbury I*, we concluded this evidence established individual issues of liability, we are now convinced, in light of *Brinker*, this evidence at most establishes individual issues of damages, which would not preclude class certification. [Defendant's] liability, if any, would arise upon a finding that its uniform rest break policy, or lack of policy, was unlawful." (*Ibid*.)

### C. The Trial Court Erred in Denying Plaintiffs' Motion for Certification

#### 1. Plaintiffs' meal and rest period claims

The trial court's order denying certification focuses primarily on plaintiffs' claims that TNS violated meal and rest break requirements set forth in Wage Order Number 4. We therefore address those claims first.

As in *Bradley*, *supra*, 211 Cal.App.4th 1129, the plaintiffs' "theory of legal liability" (*Faulkinbury, supra*, 216 Cal.App.4th at p. 232) is that TNS violated wage and hour requirements by failing to adopt a policy authorizing and permitting its technicians to take meal or rest break periods. In plaintiffs' view, TNS was obligated to implement procedures ensuring that technicians received notice of their meal and rest period rights and were permitted to exercise those rights. For the purposes of class certification, the

question is whether this theory of recovery can be "proved (or disproved) through common facts and law." (*Bradley*, *supra*, 211 Cal.App.4th at p. 1143; *Faulkinbury*, *supra*, 216 Cal.App.4th at p. 236 ["*Brinker* focuses on whether the lawfulness of an employer's lack of a rest break policy can be determined on a classwide basis"].)

The trial court provided two distinct reasons in support of its conclusion that plaintiffs' meal and rest break claims could not be determined through common proof. (*Jaimez, supra,* 181 Cal.App.4th at pp. 1297-1298 [in reviewing denial of class certification, appellate court must "'consider only the reasons cited . . . for the denial'"].) First, it found that TNS had provided substantial evidence showing that whether technicians were able to take meal and rest periods depended on their individualized "physical workplace situations." Second, the court concluded that the parties' evidence demonstrated that the staffing companies who hired many of the putative class members utilized a variety of different meal and rest period policies.

### a. Evidence that some employees worked under conditions that permitted them to take breaks is not a sufficient basis for denying certification

The trial court concluded that class certification was improper because the parties' evidence showed that some technicians' working conditions permitted them to take meal and rest breaks, while others did not. More specifically, the court found that while TNS's declarations showed that some technicians worked "on their own and at complete liberty to take breaks as they pleased, with no time or management pressure," plaintiffs' declarations showed that other technicians worked under severe time constraints that precluded them from taking "proper" meal and rest periods. According to the court, as a result of these diverse "working conditions," there was no "single way to determine whether TNS is liable to the class for failure to provide breaks."

As in *Bradley* and *Faulkinbury*, the trial court employed improper criteria in assessing whether plaintiffs' meal and rest break claims were amenable to class treatment. Rather than focusing on whether plaintiffs' theory of liability–that TNS violated wage and hour requirements by failing to adopt a meal and rest period policy –

was susceptible to common proof, the court improperly focused on whether individualized inquiry would be required to determine which technicians had missed their meal and rest periods. The written order (as well as statements made at the motion hearing) make clear that the trial court did not believe TNS would be liable upon a determination that its lack of a meal and rest policy violated applicable wage and hour requirements; rather, it concluded that TNS would become liable only upon a showing that a technician had missed breaks as a result of TNS's policies.

As explained in *Bradley* and *Faulkinbury*, however, *Brinker* "expressly rejected" this mode of analysis. (*Bradley, supra*, 211 Cal.App.4th at pp. 1143, 1151; *Faulkinbury, supra*, 216 Cal.App.4th at pp. 235, 237.) As succinctly stated in *Faulkinbury*: "the employer's liability arises by adopting a uniform policy that violates the wage and hour laws. Whether or not the employee was able to take the required break goes to damages, and '[t]he fact that individual [employees] may have different damages does not require denial of the class certification motion.' [Citation.]" (*Faulkinbury, supra*, 216 Cal.App.4th at p. 235; see also *Bradley*, supra, 211 Cal.App.4th at p. 1151 ["under the logic of [*Brinker*],when an employer has not authorized and not provided legally-required meal and/or rest breaks, the employer has violated the law and the fact that an employee may have actually taken a break or was able to [take a break] during the work day does not show that individual issues will predominate in the litigation"].) Indeed, *Bradley* and *Faulkinbury* both specifically concluded that evidence showing that some class members' working conditions permitted them to take breaks, while others did not, was not a sufficient basis for denying certification. (See *Faulkinbury, supra*, 216 Cal.App.4th at pp. 236-237 [evidence that some employees were able to "take breaks at [their] posts", while others "could not leave the assigned post for a rest break" does not "establish individual issues of liability"]; *Bradley, supra*, 211 Cal.App.4th at p. 1150 [evidence that some employees worked "alone for long periods of time" or "took the authorized rest or meal break" was insufficient to show individual issues predominated.)

We agree with *Bradley* and *Faulkinbury's* conclusion that, under *Brinker*, the fact that individual inquiry might be necessary to determine whether individual employees

27

were able to take breaks despite the defendant's allegedly unlawful policy (or unlawful lack of a policy) is not a proper basis for denying certification. Rather, for purposes of certification, the proper inquiry is "whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment." (*Ghazaryan*, 169 Cal.App.4th at p. 1531.) In this case, the plaintiffs' theory of recovery is that TNS violated wage and hour requirements by failing to adopt a policy authorizing and permitting meal and rest breaks to its technicians.

TNS, however, argues that even if the trial court improperly focused on issues related to class members' ability to establish damages, we should nonetheless affirm its ruling for two reasons. First, it contends that the applicable wage and hour provisions do not require employers to adopt a policy or implement procedures ensuring that nonexempt employees are notified of their meal and rest period rights and permitted to exercise those rights. According to TNS, the wage and hour requirements merely obligate an employer to provide a "'reasonable opportunity'" to take meal and rest breaks. TNS further contends that it introduced substantial evidence showing that many of the class members were provided such an opportunity because they were permitted to work at their own pace, free of supervision.

TNS cannot prevail on this argument. First, the trial court did not address the argument in its denial of class certification. As stated above, the scope of our review is limited to assessing the reasons "cited by the trial court for the denial"; we must "ignore other reasons that might support denial.' [Citation.]" (*Jaimez, supra,* 181 Cal.App.4th at pp. 1297-1298.) Second, TNS's assertion that it was not required to adopt the sort of meal and rest break policy envisioned by plaintiffs goes to the merits of the parties' dispute. The question of certification, however, is "'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'" (*Sav-on, supra,* 34 Cal.4th at p. 326.) Indeed, *Brinker* emphasized that, whenever possible, courts should "determine class certification independent of threshold questions disposing of the merits." (*Brinker, supra*, 53 Cal.4th at p. 1033.)

28

Alternatively, TNS contends that we should affirm the court's ruling because there is substantial evidence in the record that it did not uniformly lack a policy of authorizing and permitting meal and rest periods to its technicians. In support, it cites testimony from various TNS workers indicating that: (1) some putative class members were aware of their meal and rest break rights and believed they were entitled to take such breaks; (2) some of TNS's work sites contained "wage postings" describing employees' break rights; (3) TNS supervisors hired in 2011 were told to inform technicians of their meal and rest break rights; (3) in 2010, TNS began requiring technicians to record meal and rest break periods in the "notes" section of TNS's time-reporting software. Plaintiffs, on the other hand, contend that none of this evidence demonstrates that TNS had a formal or informal policy regarding meal and rest breaks; rather, at most, it shows only that, despite the absence of any such policy, some class members became aware of their meal and rest period rights and that TNS began to take steps to remedy their unlawful conduct years after the suit was filed in 2006.

Again, because the trial court did not address or rely on these arguments in denying certification, they are outside the scope of our review. Indeed, it would be particularly inappropriate for us to consider this argument for the first time on appeal because it which would require the weighing of evidence; that power is vested within the trial court, not the reviewing court. (See, e.g., *People v. James* (1977) 19 Cal.3d 99, 107 ["'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court'"].)

### b. *Evidence that staffing companies had diverse meal and rest period policies is not a sufficient basis for denying certification*

The trial court also denied certification of plaintiffs' break claims based on evidence that the "'staffing companies'" who hired many of the putative class members had adopted diverse meal and rest break policies throughout the class period. The court explained that because class members were subject to different "governing management policies," plaintiffs' meal and rest claims against TNS would require individualized

inquiry into the validity of each such policy. The court did not make any findings as to whether TNS required its staffing companies to adopt meal and rest break policies or to notify contractor technicians of their meal and rest break rights; nor did it address whether TNS was even aware that some staffing companies had meal and rest break policies in place. Instead, the court ruled only that the diversity of meal and rest break policies among the staffing companies raised individual issues as to whether TNS was liable to class members for failing to adopt its own meal and rest break policy.

Although not explicitly stated in the order, the court's reasoning appears to be predicated on the assumption that, even if TNS failed to comply with its meal and rest period requirements, it would not be liable to any class member who was co-employed by a staffing company that had adopted a lawful meal and rest break policy. This assumption, however, is not supported by the language of the Wage Order, which imposes an affirmative obligation on every employer to authorize and provide legally-required meal and rest breaks; if it fails to do so, it has violated the law and is liable. (See Cal. Code Res, tit. 8, § 11040, subd. (12) (A) [requiring "[e]very employer" to "authorize and permit all employees to take rest breaks . . .]; Cal. Code Res, tit. 8, § 11040, subd. (12) (A) ["no employer" shall employ any person without complying with the applicable meal period requirements]; *Bradley, supra*, 211 Cal.App.4th at p. 1150 [under *Brinker,* "when an employer has not authorized and not provided legally-required meal and/or rest breaks, the employer has violated the law" and is liable].) Although it is conceivable that, under certain circumstances, a joint employer could satisfy its affirmative meal and rest obligations by delegating those duties to a co-employer, that is not what the trial court found, or the facts demonstrate, here. Instead, the trial court effectively ruled that TNS would not be liable to any class member whose staffing company had adopted a lawful meal and rest break policy, even in the absence of any evidence showing that TNS took steps to ensure that the staffing company had such a policy in place. We fail to see how TNS could discharge its affirmative obligation to authorize and permit meal and rest breaks purely through inaction.

The trial court's ruling also failed to address plaintiffs' theory as to why the staffing companies' meal and rest break policies could not be delegated to a co-employer under the circumstances of this case. Plaintiffs theorized that TNS was required to personally authorize and permit meal and rest periods because it exerted sole control over the technicians' work sites and the manner in which they reported their hours. Plaintiffs argued that the parties' evidence uniformly showed that: (1) TNS dictated the technicians' day-to-day working conditions, including whether and when the employees could take breaks; (2) TNS was solely responsible for instructing technicians how to report their time, including whether and how to record break periods; and (3) the co-employer staffing companies had no way of knowing or controlling whether technicians' took their meal and rest breaks. Plaintiffs contend that, given the amount of immediate control TNS exerted over the workers, it was not permitted to delegate its meal and rest break obligations to a co-employer staffing company. The trial court's order does not assess whether this theory of liability – that a joint employer who exerts sole control over work site conditions and the reporting of hours must personally authorize and permit meal and rest breaks – could be determined on a class-wide basis.[10]

TNS, however, contends that we should affirm the trial court's order because substantial evidence in the record "establishes that [some] workers were aware of and influenced by the information they received from [the staffing companies] regarding their break rights." In TNS's view, this evidence shows that, even if it failed to formally authorize and permit meal and rest breaks, individualized inquiry will be necessary to

---

[10] TNS suggests that we may infer the trial court found this theory was not subject to common proof because there is substantial evidence in the record "contradicting [p]laintiffs' theory that TNS exercised complete and total control over the workers and worksites . . ." The trial court did not, however, make any findings related to the level of authority TNS had over the technicians during their day-to-day activities. Instead, the court found only that TNS's evidence showed the company subjected its technicians to varying degrees of supervision while they were working at TNS job sites. This finding does not relate to the level of control TNS possessed over the technicians; it relates to the manner in which TNS chose to exert its control.

31

determine whether some technicians nonetheless took their legally-mandated break periods, or were aware that they could, but declined to do so.

This argument, however, reflects the same type of analysis that was rejected in *Brinker*. Under *Brinker*, TNS would become liable to the class upon a determination that its uniform lack of a meal and rest policy violated the applicable Wage Order. (See *Faulkinbury, supra*, 216 Cal.App.4th at p. 235.) The mere fact that some technicians may have taken breaks (or declined to take breaks) based on information they received from other sources (i.e., the staffing companies) "does not show that individual issues will predominate in the litigation." (See *Bradley, supra*, 211 Cal.App.4th at p. 1143 ["*Brinker* . . . expressly rejected . . . that evidence showing some employees took rest breaks and other employees were offered rest breaks but declined to take them made class certification inappropriate"].)

Our analysis might be different if the trial court had concluded that the evidence showed TNS had required its staffing companies to adopt policies ensuring that technicians were aware they were authorized and permitted to take meal and rest periods while performing work for TNS. For the purposes of this appeal, however, we need not resolve such issues. We conclude only that, under the circumstances presented here, the mere fact that TNS's co-employer entities had diverse meal and rest break policies in place during the class period was not, standing alone, a proper basis for denying certification of plaintiffs' meal and rest break claims against TNS.[11]

### 2. *The trial court did not identify a proper basis for denying certification of plaintiffs' overtime claims*

The trial court also denied certification of plaintiffs' claim against TNS for failure to pay overtime. In describing the reasons for the denial, the court's order states only that the analysis of plaintiffs' meal and rest break claims "holds true for the proposed

---

[11] The trial court also denied certification of an "injunction" class based on the staffing companies' diverse management policies. For the reasons discussed above, evidence that TNS's joint employers had diverse wage and hour policies in place was not, standing alone, a proper basis for denying certification of the injunction class.

overtime class." Based on this language, we presume that the trial court concluded that certification of plaintiffs' overtime claim was improper because either: (1) given the diversity of working conditions among class members, individual inquiry would be required to determine whether each technician actually incurred overtime; or (2) TNS's evidence showed that, during the relevant class period, some staffing companies had a policy of paying overtime while others did not, thereby requiring individualized inquiry into which staffing company each employee had worked for and whether that staffing properly paid overtime. Neither reason provides a sufficient basis for denying class certification.

Fairly construed, plaintiffs theory of liability on their overtime claim is that, to the extent TNS was a joint employer of the technicians (as the trial court assumed it was), the company had a duty to ensure that all of its employees were being paid overtime (see generally *Combs, supra,* 49 Cal.4th 35 [applying wage orders' definition of "employ" and "employer" in assessing whether an alleged joint employer was liable for overtime violations].) Plaintiffs further contend that TNS violated this obligation by failing to adopt procedures verifying that the staffing companies were in fact paying the employee's overtime. If, as plaintiffs allege, TNS violated wage and order laws by failing to ensure its staffing companies paid the technicians overtime wages, it would be liable to the class.

As with plaintiffs' meal and rest claims, the trial court failed to evaluate whether plaintiffs' theory of recovery could be proved (or disproved) through common facts and law. Instead, the court appears to have concluded that, to establish TNS's liability, each technician would have to make an individualized showing that he or she incurred overtime and that his or her staffing company failed to pay them the applicable overtime rate. Those issues, however, relate to the existence and amount of each technician's damages. (See *Bradley, supra*, 211 Cal.App.4th at p. 1155 [certification was proper despite evidence that "the amount of overtime pay damages potentially due each class member [would] require[] individualized analysis because the number of hours worked each day was not uniform"].) While the trial court is correct that each technician would

33

have to make an individualized showing to recover overtime damages, "*Brinker* confirmed that '"[a]s a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages."' [Citation.]" (*Id*. at p. 1153.)

### D. *The Proper Disposition Is to Remand for Reconsideration*

Plaintiffs request that we remand this case to the trial with instructions to certify a meal and rest break class and an overtime class. We conclude, however, that on the record before us, the appropriate disposition is to reverse the order and remand with instructions for the court to reconsider plaintiff's certification motion. Although the reasons set forth in the trial court's written order do not provide a sufficient basis for denying class certification, the record demonstrates that TNS raised additional arguments which the court did not address. (See generally *Ramirez v. Balboa Thrift and Loan* (2013) 215 Cal.App.4th 765, 783 [where other grounds might exist to deny certification, proper disposition is to remand for reconsideration].) Most notably, the court's order made clear that it had assumed without deciding that TNS's status as a joint employer of the contractor technicians was amenable to class treatment. Additionally, the court did not address whether it was proper to certify a single class comprised of technicians who were hired and paid directly by TNS and technicians who were hired and paid by a staffing company.

## DISPOSITION

The trial court's order denying class certification is reversed and the matter is remanded for the court to reconsider the class certification motion. Appellants shall recover their costs on appeal.

ZELON, J.

We concur:

PERLUSS, P. J.

WOODS, J.

35