Filed 12/4/19; Modified and Certified for Pub. 12/23/19 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| DAVID CACHO et al., | B284827 |
|     Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC558689) |
|     v. | |
| EUROSTAR, INC., | |
|     Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Elihu M. Berle, Judge. Affirmed.

Matern Law Group, Matthew J. Matern and Dalia Khalili for Plaintiffs and Appellants.

Manatt, Phelps & Phillips, Andrew L. Satenberg, Benjamin G. Shatz and Cherise S. Latortue for Defendant and Respondent.

Plaintiffs David Cacho and Regina Silva assert class claims against their former employer, Eurostar, Inc., alleging Eurostar violated California wage and hour laws by failing to provide employees with required meal and rest breaks and compelling employees to work off the clock at Eurostar's Warehouse Shoe Sale (WSS) retail shoe stores in California. Plaintiffs appeal from the trial court's order denying their motion for class certification, in which the court found plaintiffs failed to demonstrate common issues of law or fact predominated over individual issues and plaintiffs' claims were not typical of the class. Plaintiffs contend Eurostar maintained uniform break and overtime policies that are facially inconsistent with the labor laws, and therefore the claims are "eminently suited" for class adjudication under *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004 (*Brinker*).

This case presents the question whether in the wake of *Brinker*, if the employer has a break policy (here, a meal break policy) that is compliant with the applicable wage order but silent as to certain requirements, does the omission of those requirements support class certification in the absence of evidence of a uniform unlawful policy or practice? Similarly, where an employer has a uniform written break policy that on its face is unlawful (here, a rest break policy), but in practice the policy has not been applied to company employees, is it nonetheless suitable for class certification? The answer to both questions is no. Although trial courts must be wary of analyzing evidence of wage and hour violations at the class certification stage in a manner that prejudges the merits, they may properly consider the evidence to determine whether classwide liability can be established through common proof.

Because plaintiffs failed to show they could prove Eurostar's liability for meal break, rest break, and off-the-clock violations by common proof at trial, the trial court did not abuse its discretion in denying class certification. In reaching its determination, the trial court did not err in considering the evidence submitted by the parties as to Eurostar's policy and practices to assist the court in making the threshold determination whether plaintiffs could prove liability for the alleged violations with common proof. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Parties*

1. *Eurostar and its WSS stores*[1]

Eurostar operates approximately 69 WSS retail shoe stores in California and has more than 2,500 hourly employees in the state.[2] At each WSS store, Eurostar employs three categories of managerial employees: store manager, assistant manager, and supervisor. The store manager is a salaried position, while the assistant manager and supervisor are nonexempt hourly positions. Nonmanagement hourly employees include head cashiers, cashiers, sales associates, apparel assistants, and loss prevention personnel. An individual store may have from nine to 26 employees.

---

[1] The factual background is taken from evidence submitted by the parties in connection with plaintiffs' class certification motion.

[2] Eurostar also operates WSS shoe stores in Nevada, Arizona and Texas. Because the lawsuit concerns only California employees, we discuss only Eurostar's California operations.

3

The store manager is responsible for overseeing all operational aspects of each WSS store, including scheduling employee shifts, scheduling and implementing employee meal breaks, and implementing company policies and procedures. The assistant manager and supervisor assist the store manager in these responsibilities. Store managers, assistant managers, and supervisors work to ensure individual stores adhere to company policies. The duties of the managerial and nonmanagerial employees are generally the same at all WSS locations.

Each WSS store manager reports to a regional district manager. All district managers report to Eurostar's Vice President of Store Operations, Plutarco Mendoza.

2. *Plaintiff David Cacho*

David Cacho was hired in January 2010 as a loss prevention officer in the San Bernardino store, then was promoted that year to sales associate, and later to cashier. At the end of 2010 Cacho transferred to the Rialto store where he worked first as a cashier, then a supervisor. In late 2011 Cacho transferred to the Riverside store, where he worked as a supervisor for approximately nine months. In September 2012 he transferred to the Fontana store where he worked as a supervisor until he was promoted to assistant manager in approximately January 2013. Cacho reported to a different store manager at each of these locations; however, the stores were all within the same district, under the supervision of district manager Juan Carlos Mancera. Eurostar terminated Cacho's employment in August 2013 for violating company policy. According to Cacho, Mancera and Fontana store manager Luis Arzate told Cacho he was terminated for tampering with the store security system.

4

3. *Plaintiff Regina Silva*

Regina Silva was hired in November 2009 as a sales associate at the Fontana store while she was still in high school, and over the next three and a half years she held multiple nonexempt nonmanagerial positions, including sales associate, cashier, and head cashier. Silva worked at the Fontana store throughout her employment, except for six months in 2013 when she worked at the San Bernardino store. From about August 2012 to August 2013 Silva reported to Cacho in his role as a supervisor or assistant manager for the Fontana store. Eurostar terminated Silva's employment in August 2013 for violating company policy. Silva believed she was terminated in connection with Eurostar's allegation Cacho had tampered with the store security system to steal money.

B. *Eurostar's Break and Timekeeping Policies*

Eurostar maintains an employee handbook setting forth the company's policies for meal breaks, rest breaks, timekeeping, and overtime. The handbook is provided to new hires at their orientation training and to all employees whenever the policies are updated. At issue in this case are the 2007 handbook (titled "Revised 04/30/2007") and the revised 2013 handbook (titled "Revised 10/2013"). The policies in the handbooks apply to all WSS stores. Individual stores are not allowed to create their own break policies.

The company's six district managers attended periodic in-person meetings at corporate headquarters, where they discussed policies and reviewed the employee handbook. They also received uniform training regarding payroll systems, store

5

standards, and employee scheduling. The district managers were responsible, in turn, for training store managers and ensuring store managers implemented company policies, including those set forth in the employee handbooks.

1. *Meal break policies*

Eurostar's 2007 and 2013 handbooks provide that employees working more than five hours per day are entitled to at least one off-duty, unpaid meal break. The 2007 handbook states: "Employees working over five (5) hours in any workday qualify for at least one-half (1/2) hour, unpaid, off-duty meal break during that workday. But, the meal period may be waived by mutual consent of management and employee if the employee's work period of less than six (6) hours completes the employee's workday. The meal period for most employees scheduled to work eight (8) hours is usually one (1) hour. [¶] Employees must clock out at the beginning of the meal period and clock back in at the end of the meal period. No supervisor is permitted to instruct an employee to skip their meal period. In certain circumstances, if an employee must take a meal break and remain on the premises, the employee is paid for the meal break. Only a supervisor can authorize an 'on-duty' meal break."

The 2013 handbook contains an identical meal break policy, except it provides as to paid on-duty meal breaks, "If the nature of an employee's work requires the employee to take a meal break on the premises, and the employee has signed a written on-duty meal period consent form, then the employee will be paid for the meal break."

6

### 2. *Rest break policies*

The 2007 handbook provides as to rest breaks: "Employees who work a minimum of four (4) hours per day are authorized to receive one (1) paid ten (10) minute rest period. Employees who work six (6) hours or more per day are authorized to receive two (2) paid ten (10) minute rest periods, one (1) in the morning before the meal break and one (1) in the afternoon."

In 2013 Eurostar revised its handbook to provide a first rest break for employees who worked at least three and a half hours of work and an additional break if they work over 10 hours: "Employees who work a minimum of three and one half (3 1/2) hours per day are authorized to receive one (1) paid ten (10) minute rest period. Employees who work six (6) hours or more per day are authorized to receive two (2) paid ten (10) minute rest periods, one (1) in the morning before the meal break and one (1) in the afternoon. Employees who work more than ten (10) hours on a given day are entitled to a third rest period of ten (10) minutes."

Both the 2007 and 2013 handbooks state, "A rest period also includes time at your workstation when you make or receive a personal telephone call, eat a snack, attend to personal business or otherwise 'relax.' The company prefers employees to take their breaks by leaving their workstation. If a break is taken at the work station, a professional atmosphere must be maintained at all times."

### 3. *Timekeeping policies and prohibition of off-the-clock work*

Eurostar employees are responsible for clocking in and out for their shifts and meal breaks and for accurately recording all

hours worked, including overtime.  The 2007 and 2013 handbooks both state, "Accurately recording time worked is the responsibility of every employee. . . .  [¶]  All employees should log in at the PC/register when they begin and end their work, as well as the beginning and ending time of each meal period. . . . Overtime work must always be approved before it is performed. . . .  [¶]  It is the employees' responsibility to key in their number and ensure the accuracy of all time worked and recorded."

The 2007 handbook elaborates, "All overtime work must be authorized in advance by a supervisor.  If an employee works overtime without prior authorization, the employee must be paid for the overtime, however, the Manager should discipline the employee for violation of this policy.  [¶]  Under no circumstances is an employee to clock out and continue working.  Any manager permitting employees to work 'off the clock' will be subject to disciplinary action up to and including termination."  The 2013 handbook contains similar language.

C.    *Plaintiffs' Class Action Complaint*

On September 25, 2014 Cacho and Silva filed a putative class action on behalf of all similarly situated current and former nonexempt Eurostar employees in the State of California at any time within the period from September 25, 2010 to the conclusion of the case.  On February 25, 2015 Plaintiffs filed their operative first amended complaint alleging 11 causes of action for violations of Industrial Welfare Commission wage order No. 7-2001 (Cal. Code Regs., tit. 8, § 11070; Wage Order) and related provisions of the Labor Code, including for:  (1) failure to provide meal breaks; (2) failure to provide rest breaks; (3) failure to pay

8

overtime wages; (4) failure to pay minimum wages; (5) failure to pay timely wages; (6) failure to pay all wages due to discharged employees; (7) failure to maintain required records; (8) failure to furnish accurate itemized wage statements; (9) failure to reimburse for work-related expenditures; (10) failure to pay unused vacation time; and (11) unfair and unlawful business practices.[3]

Plaintiffs' first amended complaint defined 11 subclasses of Eurostar employees, one for each of the 11 causes of action. Plaintiffs separated the subclasses into two time periods, class period "A" running from September 25, 2010 through the judgment, and class period "B" running from May 29, 2013 through the judgment. The meal break subclass was divided into a subclass for nonmanagerial employees (all in class period A) and managerial employees (all in class period B). According to plaintiffs, they alleged these subclasses and time periods in response to a 2013 settlement of certain wage and hour claims asserted against Eurostar in *Reyes v. Eurostar* (Super. Ct. L.A. County, 2013, No. BC475950).

D.    *Plaintiffs' Motion for Class Certification*

On October 19, 2016 plaintiffs filed a motion for class certification seeking to certify eight subclasses of nonexempt Eurostar employees, including four meal break subclasses, a rest

---

[3]    Plaintiffs also alleged a cause of action for penalties under the Labor Code Private Attorneys General Act of 2004 (Lab. Code, § 2698 et seq.; PAGA). In August 2017 plaintiffs dismissed the PAGA claim without prejudice to pursue their appeal of the court's order denying class certification.

9

break subclass, a "shaved time" subclass of employees who were paid less than the time recorded on their time sheets, an off-the-clock subclass of employees who were required to perform unpaid work while clocked out, and a subclass of employees who were not reimbursed for necessary expenditures.[4]

Plaintiffs supported their motion with Eurostar's policy manuals; the time and pay records for a sample of 108 WSS employees; declarations from Silva, Cacho, and Denia Rivas, a former Eurostar employee;[5] a declaration from plaintiffs' class

---

[4] Plaintiffs do not challenge on appeal the trial court's order declining to certify the shaved time and expenditure reimbursement subclasses. Plaintiffs have waived any argument the trial court erred in denying certification as to these subclasses. (*Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 ["Plaintiff has not raised this issue on appeal, however, and it may therefore be deemed waived."]; *Sierra Palms Homeowners Assn. v. Metro Gold Line Foothill Extension Construction Authority* (2018) 19 Cal.App.5th 1127, 1136 [appellant forfeited challenge to issue not raised on appeal].) Plaintiffs also do not raise on appeal the trial court's denial of their claims for failure to pay all wages due to discharged and quitting employees; failure to maintain required records; failure to furnish accurate, itemized wage statements; and unfair business practices, which claims plaintiffs asserted were derivative of their other claims. Nor do they raise on appeal their argument Eurostar had a policy of "auto-deducting" time for meal breaks if there was no record of an employee clocking out for a break on a qualifying shift. Plaintiffs have therefore also waived any arguments on appeal as to these claims.

[5] The trial court struck Rivas's declaration because of her repeated failure to appear for her deposition despite being served

data analysis expert, Bennett Berger; and excerpts of the deposition testimony of Silva, Cacho, Mendoza, Mancera, Christopher Habash (Eurostar's controller), and Marie MacKay (Eurostar's senior director of human resources).

In opposition to plaintiffs' class certification motion, Eurostar filed declarations from Mendoza and Abigail Vasquez, an assistant manager and former supervisor who had worked at the Baldwin Park and Riverside WSS stores. Eurostar also submitted excerpts of Berger's deposition.[6]

On reply, plaintiffs submitted a supplemental declaration from Berger and excerpts of Vasquez's deposition.

### 1. *Meal break subclass evidence*

Plaintiffs moved to certify four meal break subclasses of nonexempt managerial and nonmanagerial employees allegedly denied a 30-minute meal break during the first five hours of their shift or a second meal break before the commencement of their 10th hour of work.[7]

---

with multiple subpoenas and a court order to appear. Plaintiffs do not appeal the court's order striking Rivas's declaration.

[6] Plaintiffs and Eurostar each filed evidentiary objections. However, the trial court never ruled on the objections, and the parties do not address the objections on appeal.

[7] The Wage Order provides in relevant part, "No employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes, except that when a work period of not more than six (6) hours will complete the day's work the meal period may be waived by mutual consent of the employer and the employee." (Wage Order, § 11(A); accord Lab. Code, § 512(a).) The Supreme Court in

a.      *Plaintiffs' evidence*

Plaintiffs relied on the 2007 and 2013 handbooks as facial evidence Eurostar had a uniform meal break policy and practice that violated the Wage Order by omitting language stating employees were entitled to take their first meal break within their first five hours of work and a second meal break before starting the 10th hour of work.

Plaintiffs also presented evidence Silva and Cacho were sometimes denied or unable to take a full 30-minute meal break. Silva testified two of her managers at the Fontana store instructed her, a cashier at the time, on multiple occasions during the busy shopping season either to bring her lunch or to grab a quick lunch so she could return to her register early. Silva's Fontana managers called her back to the register during her lunch break and sometimes waylaid her before she clocked back in, telling her the store was too busy, but promising they would let her take a longer break later in the day. Silva complained on two occasions to one of the Fontana managers about him making her work during a meal break, but she never reported the violations to the manager's superiors. When Silva was a sales associate at the San Bernadino store, she observed the head cashier being called back during a break. Silva claimed most of her meal break violations occurred during Eurostar's busiest sales seasons, including back-to-school, year-end holidays, and tax season, when the stores were not staffed sufficiently to handle the volume of customer traffic.

---

*Brinker* clarified a meal break must be provided before the end of the first five hours of a shift, and a second meal break before the end of 10 hours. (*Brinker, supra,* 53 Cal.4th at p. 1049.)

Cacho testified he did not recall as a supervisor receiving any training on the company's break policies beyond that he should tell employees to take a 30-minute lunch break. As to his own meal breaks, Cacho assumed supervisors were not supposed to clock back in if their break was interrupted because he had observed his managers working during their breaks. Further, Cacho had no choice but to work during breaks on occasions when he was the only manager present in the store or if the head cashier was out sick or on a break.

Berger provided a declaration analyzing the timesheets and payroll data of 108 representative employees. Based on Berger's analysis of the clock-in and clock-out times for 31,085 shifts during the period from September 25, 2010 through November 1, 2015, Berger opined 5.7 percent of shifts over five hours had no meal break recorded, 0.9 percent of those shifts had a shortened meal break, and 5.6 percent had a late meal break, for a total of 12.3 percent of shifts having a short, late, or missed first meal break. According to Berger's analysis, the percentage of short, late, or missed first meal breaks was as high as 23.4 percent for the period from September 25, 2010 through May 28, 2013 and 5.3 percent for the period from May 29, 2013 through November 1, 2015.[8] Berger also opined Eurostar had paid only 506 hours of meal break premiums for missed meal breaks from 2013 to 2015, although he calculated there were 1,592 meal break violations.

---

[8] Eurostar adjusted its automated timekeeping practices in September 2013.

b.    *Eurostar's evidence*

In its opposition, Eurostar contended its meal break policies and practices complied with the Wage Order. Mendoza, who testified as Eurostar's person most qualified, stated the company's policy was to schedule meal breaks before the fifth hour and employees were entitled to second meal breaks "when they will pass ten hours of work." Store manager Vasquez submitted a declaration stating she scheduled employee lunch breaks to begin three to four hours after the beginning of a shift.

Vasquez also stated that in three years in management, she never received a complaint from an employee that his or her lunch break had been cut short or the employee worked while clocked out for lunch. District manager Mancera testified if a store were understaffed, a manager might ask an employee to work through a scheduled meal break or reschedule the break, but Eurostar would pay a meal break premium for any missed or late break. Mancera, Mendoza, and Habash all testified company policy required payment of meal break premiums for breaks that started after the fifth hour. Eurostar's timekeeping software automatically calculated premiums for breaks after the fifth hour, but it is not clear from the record whether this system was in place throughout the entire class period, or only after the September 2013 change in Eurostar's timekeeping practices.

Eurostar filed excerpts of Cacho's deposition testimony in which he stated he understood as a manager he was responsible for ensuring employees received meal breaks, and he had employees take their meal breaks approximately four hours into their shifts based on his understanding of company policy. Cacho understood employees had to clock in and out for meal breaks, and he never interrupted an employee during a meal break or

14

asked an employee to return to work.  As for his own meal breaks, Cacho understood he was free to leave the store, and on the occasions he returned early from a break to eat his lunch in the store, he did so voluntarily.

Silva likewise understood the company meal break policy required her to clock out for a meal break, and no one ever told her not to clock out.  Some of Silva's managers, including Cacho, were "very good" about scheduling meal breaks, while others delayed her breaks.  Silva understood she was entitled to take her meal break outside of the store.

Eurostar argued Berger's declaration overstated meal break violations.  Berger testified his analysis aggregated all instances he calculated to be short, missed, or late meal breaks for shifts over five hours, regardless of whether those shifts were shorter or longer than six hours, thus including shifts not in violation.[9]  Berger testified he had previously done an analysis that separated out shifts over six hours, but plaintiffs had not asked him to include the analysis in his declaration.  Berger also did not assume any grace period, counting any instance where an employee clocked out even one minute late as a violation.  Berger's meal break analysis also made no distinction between supervisory and nonsupervisory employees, despite plaintiffs' separate subclasses.  Berger did not speak with Cacho, Silva, or other putative class members as part of his analysis, and he did not consider possible explanations for the instances he counted as meal break violations.  Eurostar noted that even under Berger's

---

[9]     As noted, the Wage Order allows an employee to waive a meal period for a shift of no longer than six hours.  (Wage Order, § 11(A).)

15

analysis, only 12.3 percent of shifts from September 25th, 2010 to November 1, 2015 showed a late, missing, or short meal break.

2.      *Rest break subclass evidence*

Plaintiffs moved to certify a rest break subclass, defined as all Eurostar employees who worked during the period from September 25, 2010 to the date of the judgment (class period A) who were denied a 10-minute paid, uninterrupted rest break for a shift exceeding three and a half hours, a second break for an employee working more than six hours, or a third break for an employee working more than 10 hours.[10]

a.      *Plaintiffs' evidence*

Plaintiffs relied on the employee handbooks as facial evidence Eurostar had a uniform unlawful rest break policy.  The 2007 handbook stated an employee was entitled to a first rest break after four hours of work, not three and a half hours, and the handbook failed to authorize a third rest break for shifts over 10 hours.  The 2013 revised handbook addressed these omissions.

---

[10]      The Wage Order provides in relevant part, "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable shall be in the middle of each work period.  The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours or major fraction thereof." (Wage Order, § 12; see Lab. Code, § 226.7, subd. (d).)  The Supreme Court in *Brinker, supra*, 53 Cal.4th at page 1028, clarified:  "four (4) hours or major fraction thereof" means a period exceeding 3.5 hours; employees working more than six and up to 10 hours are entitled to a second rest break; and employees working 10 or more hours are entitled to a third rest break.

16

But both handbooks required that "[i]f a break is taken at the work station, a professional atmosphere must be maintained at all times," which plaintiffs offered as evidence of a policy condoning break interruptions.

Silva testified as to certain managers at the Fontana store, and to a lesser extent at the San Bernardino store, "if you didn't ask for your 10-minute breaks, you wouldn't get them." A few of Silva's managers repeatedly interrupted her rest breaks, for example, calling her back to her workstation early if the store was busy and understaffed, or instructing her while she was on break about what she needed to do after her break.

Cacho testified that when he was a nonmanagerial employee, when the store was busy his managers would sometimes tell him that he had to wait for his rest break, and sometimes he would not get his break until an hour later. Cacho's managers would interrupt his breaks multiple times per week in the busy season, and they never told him he could resume an interrupted break. As a manager, Cacho did not receive training that one of his duties was to ensure employees took their rest breaks, and Cacho did not consistently give employees under his supervision a rest break if they did not request one.

Eurostar witnesses admitted Eurostar did not have a policy of training managers to ensure employees took rest breaks absent a request. Mendoza testified employees needed to notify their supervisors when they wanted to take a rest break, and rest breaks were not typically scheduled. Mancera did not know whether management personnel were ever disciplined for failing to ensure employees received their rest breaks. Further, he believed employees were entitled to take two breaks when they

were scheduled to work eight hours (as opposed to the required break after six hours). Eurostar did not pay premiums for missed or interrupted rest breaks.

      b.     *Eurostar's evidence*

Eurostar offered evidence shifts were not scheduled for fewer than four or more than 10 hours. Mendoza testified managers were trained to schedule shifts for at least four hours, and there have been "only . . . a few occasions" when employees were scheduled to work more than 10 hours. Mancera testified the minimum shift length was four hours; Vasquez did not schedule shifts under five hours. Silva likewise testified she worked shifts of four hours or longer.

Eurostar asserted it did not have a company policy to deny employees rest breaks that were otherwise provided in its handbooks. Further, Mendoza testified there was a companywide policy requiring employees to be relieved of all duties during their rest breaks, and managers were instructed to encourage employees to leave their workstations for rest breaks. According to Mendoza, rest breaks were implemented differently in each of the stores depending on store management's preferences: Some managers might formally schedule rest breaks or instruct employees to take a break, while other managers might require employees to request one. For example, Vasquez declared her practice was to schedule rest breaks, generally within the employees' first two hours on the clock.

Eurostar also submitted deposition testimony of Silva and Cacho. Silva admitted in her deposition that whether she received a rest break depended on who her manager was at the time. One Fontana store manager ensured employees took their

18

rest breaks, Cacho and two other managers were "really good" about breaks, and another was "okay" about sending employees on breaks. Silva named five other managers, however, who did not give rest breaks unless the employee specifically asked for one, and then they sometimes would delay the break.

Cacho testified his practice as a manager was to give rest breaks when employees requested them, and during the busy season he was more likely to tell employees to take a break because they would often forget to ask. Cacho never asked an employee to return early from a rest break. Cacho did not maintain records regarding his own missed rest breaks.

### c. *Plaintiffs' rebuttal evidence*

In reply, plaintiffs submitted a supplemental declaration from Berger stating Cacho's and Silva's timesheets showed 42 instances in which Silva had worked a shift at least three and a half hours but less than 4 hours, and on eight instances Cacho worked a shift in that range.

### 3. *Off-the-clock subclass evidence*

Plaintiffs moved to certify an overtime (off-the-clock) subclass, defined as all Eurostar employees during the class period who were not paid for time they were required to work before clocking in, after clocking out, and while clocked out for meal breaks.[11]

---

[11] Because off-the-clock work in most instances violates multiple wage laws, plaintiffs' off-the-clock allegations relate to multiple causes of action and multiple subclasses, including overtime, minimum wage, and unpaid wage subclasses. These

a. *Plaintiff's evidence*

Silva testified her managers asked her on many occasions to work off the clock both during meal breaks, as discussed above, and before and after her shifts. During the Fontana store's busy seasons, Silva's manager asked her on multiple occasions to help clean up the store at night after she had clocked out. Silva spent 15 minutes off the clock cleaning the store on at least five occasions. Silva's time records were not corrected to account for this time. In addition, Silva was delayed up to 10 minutes on several occasions by customer requests for assistance before she could clock in. On occasions when Silva worked off the clock, she had to ask the store manager for a correction if she wanted to be paid.

Cacho testified he worked after clocking out at the end of a shift because "there was simply not enough time to finish the work we were given, and [he] didn't want to get written up [for working overtime]." Cacho did not cite employees under his supervision for working off the clock because he felt they were "in the same boat" as he and simply "did not have enough time to finish their job." Two store managers told Cacho they had worked off the clock.

Plaintiffs argued employees had to work off the clock because Eurostar chronically understaffed its stores and resisted overtime authorization, especially during the busy seasons. Mancera testified district managers were trained to make "sure we stick to our budget of allowed hours, that we're scheduling

─────────────────

subclasses include the same employees over the same class period, and therefore we refer to this category (as do the parties on appeal) as the "off-the-clock subclass."

properly." District managers determined store hiring needs and required store managers to stay within budgets and weekly labor hour allotments. District managers were solely responsible for approving employee overtime. Eurostar did not hire additional employees for the busy seasons; rather, current employees worked more hours during the holidays to handle the increased workload. Vasquez testified store management did not have authority to hire new employees if their store was understaffed, and the company did not hire additional employees for the busy season.

b. *Eurostar's evidence*

Eurostar referred to its handbooks as evidence of a companywide policy strongly prohibiting off-the-clock work. As discussed, the 2007 manual stated, "Under no circumstances is an employee to clock out and continue working. Any manager permitting employees to work 'off the clock' will be subject to disciplinary action up to and including termination." The 2013 manual had substantially similar language.

Silva and Cacho testified they understood company policy prohibited off-the-clock work and both an employee and manager would be subject to discipline for violations. According to Mendoza, Silva was written up by management several times for failing to clock in and out properly, and her termination resulted from her repeated failure to comply with company policies.

Cacho testified that as manager he was not aware of anyone working off the clock and never asked employees to work

21

off the clock.[12]  As an employee, no one had ever told him to work off the clock.  Cacho never reported any instance of an employee working off the clock to Mancera or human resources, and he never complained to his superiors about his own work schedule.

By Eurostar's account, Silva's off-the-clock work showed her noncompliance with company policy rather than a company practice condoning off-the-clock work.  Silva admitted she typically worked off the clock because a customer stopped her while she was on her way to the employee break room to clock in for the day or after a break, or because she felt pressure from managers to help clean up at closing time.  Her managers offered to correct her time records when she missed part of her lunch break, but she did not know whether corrections were made.  Silva maintained no records of her off-the-clock work.

E.    *Trial Court's Denial of Class Certification*

On June 21, 2017, after hearing oral argument, the trial court issued its ruling from the bench.  Citing to the Supreme Court's test for class certification in *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319 (*Sav-On*), the court analyzed whether plaintiffs met their burden to establish an ascertainable and sufficiently numerous class and a well-defined community of interest among class members, considering (1) predominant common questions of law or fact; (2) class representatives with claims typical of the class; and (3) class representatives who could adequately represent the class.

---

[12]    Cacho appears to have distinguished in his deposition between seeing employees work off the clock while he was a supervisor and not observing or ordering off-the-clock work while he was a "manager."

22

The court found plaintiffs established the putative class members were ascertainable and sufficiently numerous, and business records would be sufficient to identify which employees fell within the subclasses. The court also found plaintiffs and their counsel adequately represented the class.

However, the court denied class certification, concluding plaintiffs had not met their burden of establishing predominant common questions of law or fact or the typicality of Silva and Cacho's claims. As to meal break violations, the court rejected plaintiffs' argument the failure of Eurostar's handbook to address every circumstance in which an employee is entitled to a meal break showed a uniform policy that violated the Wage Order. Further, Cacho's and Silva's testimony was primarily limited to their experiences working together at two WSS stores (Fontana and San Bernardino) and did not demonstrate a wider unlawful practice. Moreover, plaintiffs did not offer any admissible witness testimony out of a potential class of thousands of employees to show unlawful practices (other than the stricken Rivas declaration).

The trial court found Berger's declaration unavailing because it showed a meal break compliance rate of almost 90 percent, and nearly 95 percent when focusing on the class period beginning May 29, 2013. The declaration also suffered from defects calling into doubt Berger's total count of violations, sincluding his failure to distinguish between shifts under and over six hours and to distinguish between nonmanagerial and managerial violations (the latter being limited to the post-May 29, 2013 subclass). In addition, Berger did not opine whether the putative meal break violations were caused by any company practice rather than individual circumstances.

23

As to plaintiffs' rest break claims, the court found Eurostar's policy set forth in the 2007 handbook was defective in stating a first rest break accrued after four hours rather than after three and a half hours, which could evidence a common issue, but plaintiffs failed to present any evidence Eurostar, which corrected the policy in the 2013 handbook, had a companywide practice of denying rest breaks on that basis. Silva's testimony that her rest breaks depended on whether she had a good or bad manager bolstered the court's finding individual issues predominated.

As to the off-the-clock claims, the court found Eurostar's written policies clearly prohibited off-the-clock work, and Cacho's own testimony was that as a manager he understood the policy, never allowed employees to work off the clock, and if he had, he would have been disciplined or terminated.

The court also determined plaintiffs had not established their claims were typical of the class. The testimony of Cacho and Silva was anecdotal and appeared to be based on conduct unique to their situation. Because plaintiffs had failed to obtain a single admissible declaration from a putative class member, plaintiffs had not offered any evidence to establish other class members were subject to the same policies and practices affecting Silva and Cacho. Conversely, because most of the alleged violations occurred at two WSS stores involving only two people, one of whom was in charge of enforcing company policy over the other, and where one (Silva) was cited multiple times for failing properly to clock in and out, this suggested plaintiffs' claims were atypical of the class.

The court signed a final order denying plaintiffs' class certification motion on August 9, 2017. Plaintiffs timely appealed.

24

**DISCUSSION**

A.    *Class Certification Principles and Standard of Review*

Code of Civil Procedure section 382 authorizes a class action "when the question is one of common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." "'The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.'" (*Noel v. Thrifty Payless, Inc.* (2019) 7 Cal.5th 955, 968 (*Noel*); accord, *Brinker, supra*, 53 Cal.4th at p. 1021.) The "'community of interest requirement involves three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class."'" (*Noel*, at p. 968.)

With respect to the first factor, the party seeking certification bears the burden "not merely to show that some common issues exist, but, rather, to place substantial evidence in the record that common issues *predominate*." (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108.) The moving plaintiff must also demonstrate the unlawful effects of the defendants' alleged conduct can be proven "efficiently and manageably within a class setting." (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28-29 (*Duran*).) In the wage and hour context, "where a party seeks class certification based on allegations that the employer consistently imposed a uniform

25

policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Id.* at p. 29.) Even so, "'[a]s a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'" (*Brinker, supra*, 53 Cal.4th at p. 1022); accord, *Lubin v. The Wackenhut Corp.* (2016) 5 Cal.App.5th 926, 935.) "The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'" (*Sav-on, supra*, 34 Cal.4th at p. 326; accord *Hall v. Rite Aid Corp.* (2014) 226 Cal.App.4th 278, 293 (*Hall*) ["as long as the plaintiff's posited theory of liability is amenable to resolution on a classwide basis, the court should certify the action for class treatment even if the plaintiff's theory is ultimately incorrect"].)

We review denial of a motion for class certification for abuse of discretion. (*Noel, supra*, 7 Cal.5th at p. 968; *Brinker, supra*, 53 Cal.4th at p. 1017.) "The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions." (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 (*Fireside Bank*); accord, *McCleery v. Allstate Ins. Co.* (2019) 37 Cal.App.5th 434, 450 (*McCleery*).)

26

However, "[i]f the court's 'reasons for granting or denying certification . . . are erroneous, we must reverse, whether or not other reasons [could have been] relied upon [to] support[ ] the ruling.' [Citations.] In this respect, "'appellate review of orders denying class certification differs from ordinary appellate review. Under ordinary appellate review, we do not address the trial court's reasoning and consider only whether the result was correct. [Citation.] But when denying class certification, the trial court must state its reasons, and we must review those reasons for correctness. [Citation.] We may only consider the reasons stated by the trial court and must ignore any unexpressed reason that might support the ruling."'" (*McCleery*, *supra*, 37 Cal.App.5th at p. 450.)

B.    *Certification of Wage and Hour Class Actions Under* Brinker

The Supreme Court's decision in *Brinker, supra*, 53 Cal.4th 1004, is our touchstone for analyzing whether common issues of law and fact predominate in a putative class action alleging employment policies in violation of the wage and hour laws. In *Brinker*, the plaintiffs sought certification of wage and hour claims on behalf of restaurant employees, including meal break, rest break, and off-the-clock claims. They alleged, among other things, the employer had a uniform rest break policy that violated the applicable wage order by not providing a required 10-minute rest break for employees who worked a minimum of three and a half hours, but less than four hours, and a second rest break for employees who worked more than six hours, but less than eight hours. (*Brinker, supra*, 53 Cal.4th at p. 1019.)

27

The Supreme Court affirmed the trial court's certification of the plaintiffs' rest break subclass, explaining "[c]lasswide liability could be established through common proof" the employer's uniform rest break policy violated the wage order. (*Brinker, supra*, 53 Cal.4th at p. 1033.) In reaching this conclusion, the *Brinker* court interpreted the wage order to require a 10-minute rest break for shifts exceeding three and a half hours, 20 minutes for shifts exceeding six hours, and 30 minutes for shifts exceeding 10 hours. (*Id.* at p. 1029.)

The *Brinker* court rejected the Court of Appeal's reasoning that individual issues predominated because the employer could only be liable upon a showing an employee missed his or her break due to the company policy: "An employer is required to authorize and permit the amount of rest break time called for under the wage order for its industry. If it does not—if, for example, it adopts a uniform policy authorizing and permitting only one rest break for employees working a seven-hour shift when two are required—it has violated the wage order and is liable. No issue of waiver ever arises for a rest break that was required by law but never authorized; if a break is not authorized, an employee has no opportunity to decline to take it. . . . The theory of liability—that [the employer] has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment." (*Brinker, supra*, 53 Cal.4th at p. 1033.) The Supreme Court observed, "Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment." (*Ibid.*)

The *Brinker* court concluded, by contrast, the trial court erred in certifying plaintiff's off-the-clock subclass for which there was no evidence of a common policy or common method of proof. (*Brinker, supra*, 53 Cal.4th at pp. 1051-1052.) The Supreme Court explained, "The rest period claim involved a uniform Brinker policy allegedly in conflict with the legal requirements of the Labor Code and the governing wage order. The only formal Brinker off-the-clock policy submitted disavows such work, consistent with state law. Nor has [plaintiff] presented substantial evidence of a systematic company policy to pressure or require employees to work off-the-clock . . . . As all parties agree, liability is contingent on proof [the employer] knew or should have known off-the-clock work was occurring. [Citations.] Nothing before the trial court demonstrated how this could be shown through common proof, in the absence of evidence of a uniform policy or practice. Instead, the trial court was presented with anecdotal evidence of a handful of individual instances in which employees worked off-the-clock, with or without knowledge or awareness by [the employer's] supervisors." (*Id.* at pp. 1051-1052.)[13]

In the wake of *Brinker,* the Courts of Appeal have repeatedly emphasized that a trial court should focus on plaintiffs' theory of liability, rather than the merits or defenses, in determining whether common issues predominate. (See, e.g., *Hall, supra*, 226 Cal.App.4th at p. 289 ["the court must 'focus on

---

[13] The Supreme Court remanded the case with instructions for the trial court to reconsider its certification of the plaintiffs' meal break subclass in light of the court's construction of the wage order as to meal breaks. (*Brinker, supra*, 53 Cal.4th at p. 1050.)

the policy itself' and address whether the plaintiff's *theory* as to the illegality of the policy can be resolved on a classwide basis"]; *Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 726 (*Benton*) ["the proper inquiry is 'whether the theory of recovery advanced by the plaintiff is likely to prove amenable to class treatment'"]; *Bradley v. Networkers Internat., LLC* (2012) 211 Cal.App.4th 1129, 1141, 1150 (*Bradley*) ["In ruling on the predominance issue in a certification motion, the court must focus on the plaintiff's theory of recovery and assess the nature of the legal and factual disputes likely to be presented and determine whether individual or common issues predominate."].)

If a plaintiff's theory is based on a common unlawful policy, evidence that some employees were treated differently does not defeat certification; rather, class members may individually have to prove their damages. (*Hall*, *supra*, 226 Cal.App.4th at p. 289 ["[W]here the theory of liability asserts the employer's uniform policy violates California's labor laws, factual distinctions concerning whether or how employees were or were not adversely impacted by the allegedly illegal policy do not preclude certification."]; *Benton, supra*, 220 Cal.App.4th at p. 726 ["the fact that individual inquiry might be necessary to determine whether individual employees were able to take breaks despite the defendant's allegedly unlawful policy (or unlawful lack of a policy) is not a proper basis for denying certification"]; *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 235 (*Faulkinbury*), disapproved on another ground by *Noel, supra*, 7 Cal.5th p. 986, fn. 15 ["[T]he employer's liability arises by adopting a uniform policy that violates the wage and hour laws. Whether or not the employee was able to take the required

30

break goes to damages, and '[t]he fact that individual [employees] may have different damages does not require denial of the class certification motion.'"].)

Significantly, in *Brinker*, *Hall*, *Benton*, *Faulkinbury*, and *Bradley*, the plaintiffs "pleaded and presented substantial evidence of a uniform . . . policy" or practice they alleged to be unlawful. (*Brinker, supra*, 53 Cal.4th at p. 1033; see *Hall, supra*, 226 Cal.App.4th at p. 292 [employer did not dispute it did not allow its cashier/clerks to sit while they performed checkout functions at register, which plaintiffs alleged violated wage order requirement to provide suitable seating]; *Benton, supra*, 220 Cal.App.4th at pp. 707-710 [plaintiffs submitted more than 40 employee declarations and other evidence showing employer failed to adopt meal and rest break policy and employees could rarely take full breaks]; *Faulkinbury, supra*, 216 Cal.App.4th at p. 233 [evidence established employer had uniform policy of requiring all security guard employees to take paid, on-duty meal breaks]; *Bradley, supra*, 211 Cal.App.4th at p. 1150 [plaintiffs presented evidence of employer's uniform practice of failing to provide or authorize required meal and rest breaks and evidence employees did not take required breaks].)

In cases where there is a dispute as to whether there is a uniform unlawful policy, however, it may be necessary for the trial court to weigh the evidence at the certification stage for the purpose of making the threshold determination whether there is substantial evidence of a uniform policy or practice for the purpose of determining whether common issues predominate. (*Dailey v. Sears, Roebuck & Co.* (2013) 214 Cal.App.4th 974, 991 (*Dailey*) ["We see nothing inappropriate in the trial court's examination of the parties' substantially conflicting evidence of

31

[the employer's] business policies and practices and the impact those policies and practices had on the proposed class members. . . . We therefore infer the trial court . . . weighed the parties' conflicting evidence for the sole, entirely proper, purpose of determining whether the record sufficiently supported the existence of predominant common issues provable with classwide evidence . . . ."]; see *Brinker, supra*, 53 Cal.4th at p. 1025 ["To the extent the propriety of certification depends upon disputed threshold legal or factual questions, a court may, and indeed must, resolve them."]; *Sav-on, supra*, 34 Cal.4th at pp. 328-329 [substantial evidence supported trial court's determination common issues predominated where record contained substantial, although disputed, evidence that employer had policy and practice to deliberately misclassify workers as exempt employees].)

Even if the existence of a uniform policy is not in dispute, the trial court may consider the evidence to determine whether the defendant's liability under the policy is susceptible to common proof. (See *Brinker, supra*, 53 Cal.4th at p. 1033 ["Classwide liability could be established through common proof if [plaintiff] were able to demonstrate that [the employer] under this uniform policy refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours."].) In these circumstances, a trial court is not deciding whether employees "were able to take breaks despite the defendant's allegedly unlawful policy" (*Benton, supra*, 220 Cal.App.4th at p. 726), but rather, whether "the evidence supports the conclusion that individual questions would predominate in the proof of *liability*, not just damages." (*Payton*

*v. CSI Electrical Contractors, Inc.* (2018) 27 Cal.App.5th 832, 843.)

C.  *Individual Questions Predominate as to Plaintiffs' Meal Break Claims*

Plaintiffs contend the trial court erred in rejecting Eurostar's written meal break policy as prima facie evidence of a uniform unlawful meal break policy and discounting plaintiffs' evidence of a policy and practice of meal break violations.  As discussed, Eurostar's written meal break policy as stated in the 2007 and 2013 handbooks provided, "Employees working over five (5) hours in any workday qualify for at least one-half (1/2) hour, unpaid, off-duty meal break during that workday." Plaintiffs argue the policy is unlawful because it does not specify an employee's meal break should commence *within* the first five hours of work and does not authorize a second meal break for shifts exceeding 10 hours.  Plaintiffs contend Eurostar's written policy therefore evidences a uniform unlawful policy appropriate for class adjudication under *Brinker*.  (See *Brinker, supra*, 53 Cal.4th at p. 1033.)  It does not.

As the trial court correctly observed, "[W]ith regard to the meal-break issue, the plaintiffs' argument is not that the language of the policies as written affirmatively conflict with California law.  Rather, plaintiffs' argument is essentially that the written policies are noncompliant for omitting certain language; that is, not going far enough in expressing all aspects of the legal requirements."  The fact Eurostar's employee handbook does not address when meal breaks are given within a shift is not evidence the company has a policy not to provide meal breaks within the first five hours.  Likewise, the fact Eurostar's

handbook authorizes "at least" one half hour meal break for a shift over five hours is not evidence the company has a policy to deny employees a second break for shifts exceeding 10 hours. The trial court concluded "the fact that policies did not embody every aspect of the Labor Code does not particularly cut in either party's favor in this case."

Because there is no uniform written policy regarding the timing of the first and second meal breaks, the trial court did not err in considering the parties' testimony and statistical evidence regarding Eurostar's policies and practices to determine whether plaintiffs' proof of Eurostar's liability at trial would involve common or individual issues. (See *Dailey, supra*, 214 Cal.App.4th at p. 991 [trial court properly weighed the evidence for the "purpose of determining whether the record sufficiently supported the existence of predominant common issues provable with classwide evidence"].)

The holding in *Brinker* is not to the contrary. In *Brinker*, the Supreme Court determined the wage order required a rest break after three and a half hours, but it was undisputed the defendant's uniform rest break policy authorized a break only after four hours; accordingly, the employer's liability presented a matter of common proof. (*Brinker, supra*, 53 Cal.4th at pp. 1030-1031.) Here, by contrast, the substance of Eurostar's meal break policy is disputed. Eurostar offered evidence it had a companywide policy to schedule meal breaks in the first five hours and to provide a second meal break for shifts exceeding ten hours. The handbook did not provide otherwise. Therefore, there is no facially unlawful policy from which to infer Eurostar's classwide liability is a matter of common proof.

34

This case is readily distinguishable from *Bradley, supra*, 211 Cal.App.4th at page 1140, on which plaintiffs rely to argue a policy omission is effectively the same as a facial violation for purposes of the certification analysis. In *Bradley*, the defendant employer admitted it did not have meal or rest break policies in place for its workers, nor did it offer any evidence its workers ever received breaks. The employer argued nonetheless class certification was not warranted under *Brinker* because the plaintiffs alleged only the unlawful absence of a rest policy, rather than an affirmatively unlawful rest break policy. (*Bradley*, at p. 1150.) The Court of Appeal rejected this distinction, explaining that "[u]nder *Brinker* and under the facts here, the employer engaged in uniform companywide conduct that allegedly violated state law." (*Ibid.*) The *Bradley* plaintiffs presented substantial evidence "none of the workers was provided, or given authorization to take, the required meal or rest breaks," including five declarations in which employees stated they did not take rest breaks because of the nature of the work and the belief they would be fired if they stopped working. (*Ibid.*) The defendant "did not present *any evidence* showing it had a formal or informal practice or policy of permitting the required breaks or that any worker believed he or she was entitled to take a legally required rest or meal break, or that some or all workers took these breaks." (*Ibid.*)

Here, unlike *Bradley*, Eurostar presented substantial evidence it had a companywide policy to provide lawful meal breaks. Mendoza, as the person most qualified for Eurostar, testified Eurostar's meal break policy was to schedule employees to take a break within the first five hours and to authorize a second meal break for shifts exceeding 10 hours. Eurostar's

35

companywide policy required it to pay employees a one-hour wage premium if a meal break began after the fifth hour, and for at least some portion of the class period, Eurostar's timekeeping software paid the penalties automatically.  Store manager Vasquez testified she scheduled employee lunch breaks to begin three to four hours into each shift to avoid the risk of a late break.  Cacho likewise testified he understood he was responsible as a manager for ensuring employees received meal breaks, and he sent employees on their breaks approximately four hours into their shifts based on his understanding of company policy.

Although Silva and Cacho testified to several instances of missed, delayed, and interrupted meal breaks at the two WSS stores where they primarily worked, Silva admitted that whether she missed meal breaks depended on individual managers rather than a company policy.  Silva and Cacho did not offer any evidence of a company policy, or even a widespread company practice, of Eurostar denying meal breaks.

Instead, plaintiffs principally relied on Berger's statistical analysis of employee timecard data as evidence of a companywide policy of meal break violations.  Berger opined 12.3 percent of shifts in his sample showed a meal break that was missed, short, or late.  The trial court did not consider this figure to be high enough to support the inference of an unlawful companywide policy, and the court also found several aspects of Berger's analysis overstated the number of meal break violations.  For example, Berger failed to separate out shifts under six hours, for which an employee could waive the meal break, and Berger did not account for alternative causes of missed or late meal breaks indicated by the timesheet data, for example if an employee failed to clock out promptly for a meal break that was timely

36

authorized. Berger's analysis also did not break down the violations by store, so there was no way for the court to assess whether violations could reasonably be attributed to a uniform policy across different stores, rather than concentrated at one or two stores under certain managers. More broadly, Berger did not survey any employees as to the reasons for their missed, late, or interrupted meal breaks, nor did he opine as to the reasons for any missed meal breaks.

Absent a showing by plaintiffs that they can prove liability for meal break violations by common proof at trial, Berger's statistical analysis cannot alone support class certification. (*Duran, supra*, 59 Cal.4th at p. 31 ["While sampling may furnish indications of an employer's centralized practices [citation], no court has . . . 'suggested that statistical sampling may be used to manufacture predominate common issues where the factual record indicates none exist.'"].)

In the absence of an express unlawful meal break policy, evidence of Eurostar's policy to the contrary, and plaintiffs' purely anecdotal evidence of missed meal breaks, plaintiffs would need to call numerous employees from different stores to testify at trial about their missed meal breaks in order to prove a uniform policy or practice of not providing meal breaks. On this record, the trial court did not abuse its discretion in finding plaintiffs could not prove Eurostar's liability for meal break violations at trial by facts common to members of the class.

D.    *Individual Questions Predominate as to Plaintiffs' Rest Break Claims*

1.    *The trial court did not abuse its discretion in concluding Eurostar did not have a uniform practice of denying required rest breaks*

Plaintiffs contend the trial court abused its discretion in denying class certification as to the rest break subclass because Eurostar's pre-2013 rest break policy set forth in its 2007 handbook, by authorizing a first rest break after four hours (instead of three and a half hours), is facially unlawful.[14] Plaintiffs are correct Eurostar's pre-2013 rest break policy is inconsistent with the Wage Order, providing some evidence of a uniform unlawful policy. But it does not follow that Eurostar had a uniform practice of denying rest breaks for employees who worked fewer than four hours. As the *Brinker* court cautioned, courts must examine the pleadings and evidence to determine whether "'the theory of recovery advanced by proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.'" (*Brinker, supra*, 53 Cal.4th at p. 1021). Here it is not.

In *Brinker*, the employer conceded it had a common, uniform rest break policy that applied to all employees. (*Brinker, supra*, 53 Cal.4th at p. 1033.) Indeed, the *Brinker* court described the policy as one "consistently applied to a group of employees."

---

[14]    Eurostar's 2007 handbook also did not expressly authorize a third rest break for shifts of 10 hours or longer, as required by the Wage Order. However, similar to the handbook's omission of detail on the timing of meal breaks, there is no substantial evidence Eurostar had a policy or practice to deny a third rest break.

(*Ibid*.) The question was whether individual issues predominated because employees could waive their rest breaks. The *Brinker* court concluded there was a common issue suitable for class certification because plaintiffs "pleaded and presented substantial evidence" the employer applied a uniform unlawful policy; whether individual employees declined a break was not relevant as to liability because the employees were never authorized to take one. (*Ibid*.)

As discussed, the existence of a uniform unlawful policy does not necessarily mean the employer has liability for violations that can be demonstrated with common proof. (See *McCleery, supra*, 37 Cal.App.5th at p. 452 [employer's failure to adopt meal and rest break policies, even where plaintiffs' survey confirmed employees were denied breaks, was not sufficient to establish common liability where the "survey failed to ask if anyone ever worked long enough in a day . . . to be entitled to a meal or rest period"].)[15]

_____

[15] In addition, even where a plaintiff has asserted a common theory of liability, he or she must also demonstrate a class action is procedurally superior to individual actions. (*Duran, supra*, 59 Cal.4th at p. 29 [where the party proposing a class asserts "the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting"]; see *Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, 384 [to merit class certification, plaintiffs must "present substantial evidence that proving both the existence of the defendant's uniform policy or practice and the alleged illegal effects of that policy or practice could be accomplished efficiently and manageably within a class setting"].)

39

Here, plaintiffs have failed to present any, let alone substantial, evidence Eurostar had a practice to deny rest breaks for shifts between three and a half and four hours. Neither Silva nor Cacho testified she or he ever missed a rest break on a shift longer than three and a half but shorter than four hours. Although Berger presented evidence in reply that Silva and Cacho worked multiple shifts between three and a half and four hours (42 and eight shifts over three years, respectively), he did not opine whether they missed rest breaks during those shifts. And Berger did not present evidence of how many shifts of this length were scheduled companywide.

Eurostar's witnesses testified the company had a policy and practice not to schedule shifts shorter than four hours. Consistent with this policy, Vasquez testified her practice was to schedule employees to take their first break within the first two hours of their shift.

Silva and Cacho testified their rest breaks were frequently interrupted or delayed. But Silva conceded that in most instances when she missed a break she had not asked to take it. Unlike the requirements for compulsory meal breaks, the Wage Order requires employers to "authorize and permit" employees to take their 10-minute rest breaks. (Wage Order, § 12(A).)

On this record, the trial court did not err in considering the parties' evidence to determine whether plaintiffs could establish through common proof that Eurostar had an unlawful rest break policy and practice. The court did not abuse its discretion in concluding they could not.

2. *The trial court did not err in denying class certification without expressly rejecting plaintiffs' on-duty rest break argument*

Plaintiffs contend the language in the 2007 and 2013 handbooks requiring employees to maintain a "professional atmosphere" while taking rest breaks at their work station does not guarantee duty-free rest breaks, thereby violating the Wage Order. (See *Augustus v. ABM Security Services, Inc.* (2016) 2 Cal.5th 257, 269-270 (*Augustus*) [Applicable wage order "cannot be reconciled with permitting employers to require employees to remain on call. . . . [A] rest period means an interval of time free from labor, work, or any other employment-related duties."].) Plaintiffs argue the trial court erred by failing to address this argument in its ruling, requiring reversal. We conclude otherwise.

As a threshold matter, plaintiffs did not argue in their certification motion the court should certify an "on-duty rest break class," instead only describing the rest break subclass as including employees who worked shifts of more than three and a half hours, nor did they cite *Augustus*. Rather, plaintiffs only noted in passing the rest break policy in the employee handbooks provided a rest break could be taken at an employee's work station while the employee takes a personal call, eats a snack, attends to personal business, or relaxes. To the extent the on-duty rest break argument was part of their request to certify a rest break subclass, plaintiffs have not cited any authority (nor is there) for the proposition a trial court must address and dispatch every piece of evidence and argument raised in ruling on a certification motion.

41

Plaintiffs' reliance on *Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052 is misplaced. There, the trial court refused to hear oral argument, made no findings, and issued a one-sentence order stating it was denying the motion for class certification. (*Id.* at p. 1060.) The Court of Appeal remanded for the trial court to provide a more detailed order, explaining, "[T]he record is so devoid of explanation that it is impossible to comply with the Supreme Court's mandate that 'we must examine the trial court's reasons for denying class certification.' [Citation.] We cannot tell if improper criteria were used or erroneous legal assumptions were made. . . . Plainly, our standard of review requires that there be some enunciation of a reason or basis for denial of class certification from which we can determine the soundness of the lower court's decision." (*Id.* at pp. 1064-1065.)

Here the trial court made a detailed ruling in which it addressed the rest break subclass, finding plaintiffs had not presented substantial evidence of predominate common issues.[16]

---

[16] Plaintiffs also contend the trial court failed to address their claim Eurostar did not pay premiums for missed rest and meal breaks. Like plaintiffs' on-duty rest break claim, the asserted nonpayment of premiums was addressed only in the context of certification of the meal and rest break subclasses. Eurostar's testimony and Berger's analysis show meal premiums were paid, although not in proportion to the number of meal break violations Berger calculated. But plaintiffs presented no evidence of a common policy or practice not to pay meal break premiums. With respect to rest breaks, Eurostar admitted it had not paid rest break premiums during the class period, but unlike meal breaks, rest breaks were not compulsory absent an employee request. Further, plaintiffs presented no evidence of a companywide policy to deny rest breaks or to fail to pay a premium for missed breaks.

42

Nor is there any merit to plaintiffs' argument the handbooks—by requiring employees who opt to remain at their work stations during rest breaks maintain "a professional atmosphere"— thereby requires "on-duty" rest breaks. The policy here is not analogous to the unlawful policy in *Augustus* requiring employees "to keep radios and pagers on, remain vigilant, and respond if the need arose" during their rest breaks. (*Augustus, supra*, 2 Cal.5th at p. 270.)

E.    *Individual Questions Predominate as to Plaintiffs' Off-the-clock Work Claims*

Plaintiffs contend the trial court erred in refusing to certify an off-the-clock subclass comprised of employees required to work before or after their shifts or during meal breaks. Eurostar's written policies set forth in its employee handbooks expressly prohibit off-the-clock work, stating "[u]nder no circumstances is an employee to clock out and continue working" and providing for discipline of employees and managers for violating the policy. Silva and Cacho both testified this policy was communicated to employees and managers, they understood this policy, and they knew they could be subject to discipline for violations.

Plaintiffs' off-the-clock claim is on all fours with *Brinker*, which affirmed the trial court's denial of class certification. As in *Brinker*, Eurostar's "only formal . . . off-the-clock policy submitted disavows such work, consistent with state law." (*Brinker, supra*, 53 Cal.4th at p. 1051.) And, as in *Brinker,* plaintiffs did present countervailing evidence of a companywide policy to pressure or require employees to work off the clock. To the contrary, the trial court found the testimony of Silva and Cacho as to instances in which they felt pressured to work off the clock was anecdotal and

43

specific to particular managers, circumstances, and locations.[17] (See *id.* at pp. 1051-1052 ["Instead, the trial court was presented with anecdotal evidence of a handful of individual instances in which employees worked off-the-clock, with or without knowledge or awareness by [the employer's] supervisors."].) Moreover, although plaintiffs contend WSS stores were chronically understaffed, the testimony of Eurostar witnesses establishes only that district managers, rather than store managers, determined hiring needs, weekly labor allotments, and overtime approvals, and that Eurostar preferred to schedule existing employees to work more hours rather than to hire new employees during busy seasons. There is no evidence these management practices were intended or resulted in pressuring employees to work off the clock.

On this record, the trial court did not err in considering the parties' evidence or abuse its discretion in finding plaintiffs failed to present substantial evidence that liability for alleged off-the-clock violations could be established through common proof. (*Brinker, supra*, 53 Cal.4th p. 1052 ["[W]here no substantial evidence points to a uniform, companywide policy, proof of off-

_____

[17] Plaintiffs contend the trial court's reliance on Eurostar's written off-the-clock policy was reversible error because it determined the merits of Eurostar's common defense at the class certification stage. (See *Brinker, supra*, 53 Cal.4th at p. 1023.) But in discussing the written policy, the trial court was not adjudicating the merits of Eurostar's defense; rather, the court was properly examining the evidence to determine whether common issues predominated. (*Id.* at pp. 1023-1024 ["When evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them."]; see *Dailey, supra*, 214 Cal.App.4th at pp. 990-991.)

44

the-clock liability would have to continue in an employee-by-employee fashion, demonstrating who worked off the clock, how long they worked, and whether [the employer] knew or should have known of their work."].)

F.      *The Trial Court Did Not Abuse its Discretion in Finding Plaintiffs' Claims Are Not Typical of the Class*

"Certification requires a showing that the class representative has claims or defenses typical of the class." (*Fireside Bank, supra*, 40 Cal.4th at p. 1090.)  "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" (*Hanon v. Dataproducts Corp.* (9th Cir. 1992) 976 F.2d 497, 508; see also *Fireside Bank*, at pp. 1090-1091 [applying *Hanon* to typicality analysis].)  We review a trial court's ruling on typicality with "great deference on appeal, reversing only for a manifest abuse of discretion." (*Fireside Bank,* at pp. 1089-1090.)

Plaintiffs contend the trial court erred in finding Silva and Cacho were atypical of the class because the court failed to recognize plaintiffs' meal break, rest break, and off-the-clock claims arose from common unlawful policies uniformly applicable to all class members, including Silva and Cacho.  But as discussed, we affirm the trial court's finding that plaintiffs failed to show they could present common proof of Eurostar's alleged violations.  Further, the trial court identified six bases for its ruling plaintiffs' claims were not typical of the proposed class: (1) the anecdotal nature of plaintiffs' evidence; (2) plaintiffs' ability to procure only a single declaration from a putative class

member, which was stricken after she failed repeatedly to appear at her deposition; (3) plaintiffs' failure to establish the class members were affected by the asserted policies and practices; (4) a majority of the noncompliance alleged by plaintiffs took place at two stores involving the same two people; (5) Silva principally complained of violations of policies that Cacho, as her supervisor, was charged with enforcing; and (6) Silva was disciplined for failure to comply with company policy, including timekeeping requirements.  In light of these factors, the trial court did not abuse its discretion in determining Cacho and Silva were not typical of the putative class.

Finally, plaintiffs urge us to grant leave to amend their complaint to name a suitable class representative.  But because we affirm the trial court's ruling that common issues of law or fact do not predominate, there is no basis to grant plaintiffs leave to name a new representative.

## DISPOSITION

We affirm the trial court's order denying class certification. Eurostar is entitled to recover its costs on appeal.


FEUER, J.

WE CONCUR:


PERLUSS, P. J.              ZELON, J.

46

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DAVID CACHO et al., | B284827 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC558689) |
| v. | |
| EUROSTAR, INC., | ORDER MODIFYING AND CERTIFYING OPINION FOR PUBLICATION |
| Defendant and Respondent. | NO CHANGE IN JUDGMENT |

THE COURT:*

The opinion in the above-entitled matter filed on December 4, 2019 is modified as follows:

1.     The opinion was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in the Official Reports, and it is so ordered.

2.     On page 43, under part E., in the second paragraph, third sentence, add the word "not" between "did" and "present" so that it reads:

And, as in *Brinker,* plaintiffs did not present countervailing evidence of a companywide policy to pressure or require employees to work off the clock.

There is no change in the appellate judgment.

---

\*      PERLUSS, P. J.         ZELON, J.         FEUER, J.

2